Harlan FEDER, Plaintiff,

v.

The VIDEOTRIP CORPORATION, Jerry L. Turner, and Alfred T. Romanoski, Jr., Defendants.

The VIDEOTRIP CORPORATION, Third Party Plaintiff,

v.

TELEMATION PRODUCTIONS, INC., Third Party Defendant.

TELEMATION PRODUCTIONS, INC., Fourth Party Plaintiff,

v.

Gene GUERIN and Mi Tierra Media, Fourth Party Defendants.

Civ. A. No. 87–C–545.

United States District Court, D. Colorado.

Aug. 12, 1988.

Stephen B. Schuyler, of Feder, Morris, Tamblyn & Goldstein, Denver, Colo., Harry G. Melkonian, White & Case, Los Angeles, Cal., for plaintiff.

Gary C. Davenport, McGloin, Davenport & Severson, Denver, Colo., for defendants

David A. Weinstein, Denver, Colo., for third-party defendant.

Charles H. Jacobs, Bourke & Jacobs, Harry L. Simon, Susan F. Baker, and Phillip Klass, Denver, Colo., for fourth-party defendants.

## ORDER

CARRIGAN, District Judge.

Plaintiff Harlan Feder commenced this action for copyright infringement against the Videotrip Corporation ("Videotrip"), and its founders Jerry L. Turner and Alfred T. Romanoski, Jr. Jurisdiction is alleged to exist under 28 U.S.C. § 1338.

Feder was the primary author of *Colorado Winterguide* ("*Colorado Winterguide*" or "the Guide"), a travel guide that describes 28 Colorado winter resorts through "[c]omprehensive, objective insights ... without being obscured by well-intentioned but occasionally misleading promotional hype." (Introduction to *Colorado Winterguide*, at 3; defendants' Exhibit A.) It was published by Wayfinders Press in August 1984. On December 5, 1984, the Register of Copyrights issued a Certificate of Registration for the Guide. Although it sold 3,450 copies in its first year, sales never covered the cost of production.[1]

Defendant Videotrip is in the business of producing and marketing travel videotapes. It was formed in January 1985. Romanoski was an officer, director, and employee of Videotrip until he resigned in August 1985. Turner was the president, a director, and an employee until he resigned in November 1987.

In January 1985, Videotrip decided to produce travel videotapes about Colorado ski resorts, calling them "Colorado Ski Resorts" ("Videotapes"). In March 1985, the defendant Romanoski contacted *Colorado Winterguide*'s publisher regarding use of the Guide for the Videotapes. Subsequently Feder offered to sell the rights to the Guide for $7,500 plus film credit. Romanoski refused this offer.

Also in March 1985 Videotrip hired third-party defendant and fourth-party plaintiff Telemation Productions, Inc. ("Telemation") to write the script for, edit and produce the Videotapes. In turn, Telemation hired the fourth-party defendant Gene Guerin to write the scripts for Parts 1 and 2. Turner met with Guerin and offered him a sentence outline detailing the kind of information he wanted included in the scripts. In preparing the outline, Turner at least partly relied on an assortment of resource materials, including *Colorado Winterguide*. Turner offered these materials along with the sentence outline to Guerin, who accepted only the outline.

Videotrip ultimately produced and sold three Videotapes. "Colorado Ski Resorts Part 1" ("Part 1") covers nine ski resorts. Its sequel, "Colorado Ski Resorts Part 2" ("Part 2"), covers eight additional resorts. The third videotape combined the nonduplicative segments of Parts 1 and 2. Defendants allege, and the plaintiff does not appear to dispute, that total sales of the Videotapes never covered the cost of production.

Feder claims that the defendants have willfully infringed upon his registered copyright by creating and distributing the Videotapes in violation of the Copyright Act, 17 U.S.C. § 501 *et seq.* (the "Act").[2] Videotrip alleges that Telemation is liable for breach of warranty under an agreement by which the latter allegedly promised to obtain all permissions necessary for the production of the Videotapes. Telemation asserts that Guerin and Mi Tierra Me-

1. The Guide's production costs through June 1986 were $38,339.73. Total sales were 5,157 copies, which generated $21,658.98. As of June 30, 1987, after 74 books were returned to the publisher from distributors, only 5,083 copies of the original 10,000 copies printed had been sold. The unsold copies were destroyed.

Notably, Feder concedes that the Videotapes were not responsible for the Guide's dropping off in sales. (Feder deposition, pp. 33–34; defendants' exhibit B.)

2. Section 501, 17 U.S.C., provides in pertinent part:

"(a) Anyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright.

"(b) The legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it."

dia are liable to it in the event Telemation is held liable to Videotrip.

On January 15, 1988, Telemation moved for summary judgment against Videotrip. By order dated February 19, 1988, I denied that motion on the ground that genuine issues of material fact precluded summary judgment against Videotrip.

Currently pending are two motions for summary judgment: Defendants collectively have moved for summary judgment dismissing the complaint and action. Additionally, the defendant Romanoski individually has moved for summary judgment on the ground that as a matter of law he cannot be held personally liable for Videotrip's alleged copyright infringements. Also pending are the plaintiff's and the defendants' cross-requests for attorneys' fees and costs pursuant to Rule 11, Fed.R. Civ.P.

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Catrett* the Court held that Rule 56 mandates the entry of summary judgment, and upon motion and after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. The Court explained:

"In such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she had the burden of proof." *Id.* at 322–23, 106 S.Ct. at 2552–53.

The parties have briefed the issues and oral argument would not materially assist my decision. I shall address separately each motion for summary judgment, and the cross-requests for attorneys' fees and costs.

## I. *Defendants' Collective Motion for Summary Judgment.*

In order to establish a claim for copyright infringement under 17 U.S.C. § 501(a), a plaintiff must show: (1) ownership of a valid copyright; and (2) copying by the defendant of copyrightable material. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.1986), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed. 721 (1986); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir.1977). It is undisputed that Feder has a valid copyright in the Guide. Thus only the second requirement is in issue. Notably, the test for infringement is the same even when the defendants' work is in a different medium than the plaintiff's. *Twentieth Century Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 n. 4 (9th Cir.1983).

"Copying" may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that substantial similarities exist as to protectible material in the two works. *Walker*, at 48.[3] It is undisputed that the defendants had access to *Colorado Winterguide* before production and distribution of the Videotapes. Thus the only remaining issue is whether the plaintiff's evidence has established that there is a genuine issue of material fact regarding the existence of substantial similarities in the Videotapes and the Guide as to copyrightable material. I begin by discussing the phrases "copyrightable material" and "substantial similarity."

---

**3.** "It should here be noted, however, that although proof of access and substantial similarity are *sine qua non* to a finding of copying, such evidence does not require the trier of fact to find copying." 3 M. Nimmer, *Nimmer on Copyright* § 13.01[B], at 13–7 (1988).

## A. Copyrightable Material.

The definition of "copyrightable material" is significant for what it excludes. For example, copyright protection does not extend to ideas as such, but only to the author's particular *expression* of those ideas. *Walker*, 784 F.2d at 48. Nor does copyright law protect facts underlying such expression. Thus "[t]he copyright in a book dealing with factual matters will not be infringed by a work that copies such facts ... in a manner in which *the particular verbal description of such facts is not copied.*" 3 M. Nimmer, *Nimmer on Copyright*, § 13.03[A], at 13–24 (1988) (emphasis added); *see also Cooling Systems and Flexibles, Inc. v. Stuart Radiator*, 777 F.2d 485, 491 (9th Cir.1985) ("Copyright law never protects the facts and ideas contained in published works.... An author can claim to 'own' only an original manner of expressing ideas or an original arrangement of facts"); *Hoehling v. Universal Studios, Inc.*, 618 F.2d 972, 978 (2d Cir. 1980), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) (there is no copyright protection extended to the presentation of facts or their selection); *Werlin v. Reader's Digest Assoc.*, 528 F.Supp. 451, 462 (S.D.N.Y.1981) ("[f]actual information is in the public domain and hence not protectible").

As observed in *Werlin:*

"The federal copyright laws do not protect either the event or the author's idea to write about the event; they afford protection only to the *author's manner of expression*, that is, *the author's analysis or interpretation of events, the way he or she structures material and marshals facts, the author's choice of words, and the emphasis the author gives to particular developments.*" 528 F.Supp. at 461–62 (emphasis added.)

*See also O'Neill v. Dell Publishing Co.*, 630 F.2d 685, 686 (1st Cir.1980) (copyright protection is limited to the arrangement of words the author uses to express his ideas).[4]

Thus even if a plaintiff can prove substantial similarity between the defendants' work and his, "copyright protection does not extend to historical or contemporary facts, material traceable to common sources or in the public domain and *scenes a faire.*" *Walker v. Time Life Films, Inc.*, 615 F.Supp. 430, 435 (S.D.N.Y.1985), *aff'd*, 784 F.2d 44 (2d Cir.1986), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). "Scenes a faire" are "incidents, characters or settings which, as a practical matter, are indispensable or standard in the treatment of a given topic," and are not protected under the copyright law. *Id.* at 436. For example, in *Walker*, where the author of the book *Fort Apache* sued the maker of the motion picture "Fort Apache: The Bronx," the district court ruled that the book's descriptions of violence and low police morale were not protected expression because "[i]n any account based on experiences of a poverty stricken, crime-ridden environment, depictions of bribery, prostitution, purse-snatching and neighborhood hostility to law enforcement officers are inevitable." *Id.*

Moreover, copyright protection does not even extend to facts or real events discovered through original research. *Walker*, 784 F.2d at 49; *see also Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir.1981) ("[t]o hold that research is copyrightable is no more or no less than to hold that facts discovered as a result of research are entitled to copyright protection"); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 U.S. 303, 310 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) (court

---

**4.** I note that Justice William O. Douglas likely would have denied copyright protection to the entire *Colorado Winterguide*. *See Lee v. Runge*, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971) (Douglas, J., dissenting from denial of certiorari) ("[w]here as here, a writer has published a book which compiles and applies information available to all men, should that writer have a monopoly on the ideas in that book through a copyright issued merely because the words used were the author's own?"). Justice Douglas advocated application of the "novelty" standard used in patent law. " 'Novelty' in this context means that no similar wor predates the work in question." Denicola, *Copyright in Collections of Facts: A Theory for the Protection of Nonfiction Literary Works*, 81 Colum.L.Rev. 516, 521 n. 24 (1981).

refused to "subscribe to the view that an author is absolutely precluded from saving time and effort by referring to and relying upon prior published material").

For purposes of determining whether certain material in the Guide is copyrightable, the most relevant passages are those found at the beginning of each section describing a particular ski resort. It is in these pages that Feder and his co-authors provide most of their personal observations regarding that specific resort. For example, the section on Aspen begins:

"Aspen is Colorado's quintessential ski resort town, a paradoxical blend of elite sophistication and rustic influences. It's a glamorous, cosmopolitan playground of international renown for celebrities and the super-rich. But Aspen is also a small Victorian mountain community situated in one of the most beautiful valleys in the state, a place where practically every kind of lifestyle and temperament is possible and permissible.

\*     \*     \*     \*     \*     \*

"There are four ski mountains to choose from in the Aspen area. The average skier, like an alpine Goldilocks, will most likely find Aspen Mountain too hard, much of Buttermilk too easy, Snowmass and Aspen Highlands just right." (Page 11.)

Notably, most of the material in the above-quoted passage is not "copyrightable." That Aspen is a Victorian community in a beautiful valley is a fact. Similarly it is a fact that there are four ski mountains in the Aspen area, and that Aspen Mountain provides more difficult terrain than the others. Additionally, the presence of celebrities and politicos is part of the area's "scenes a faire." However, assuming that the allusion to Goldilocks originated with the Guide's authors, that analogy constitutes expression of an original insight, and is precisely the type of language protectible under the Act. Thus the plaintiff must show that this type of expression appears

in the Videotapes, and renders them substantially similar to the Guide.

B.  Substantial Similarity.

"[T]he determination of the extent of similarity which will constitute a *substantial* and hence infringing similarity presents one of the most difficult questions in copyright law, and one which is the least susceptible of helpful generalizations." 3 M. Nimmer, *supra,* § 13.03[A], at 13–20. The heart of the issue is whether there exists between the Guide and the Videotapes substantially similar expression.

"Substantial similarity" is measured by the standard of the "ordinary reasonable person." *O'Neill, supra,* at 687; *Sid & Marty Krofft Television Prods., Inc., v. McDonald's Corp.,* 562 F.2d 1157, 1164 (9th Cir.1977). The standard also has been phrased as that of the "ordinary observer." *Novelty Textile, supra,* at 1093. "The test of substantial similarity is whether the resemblance would be recognized by ordinary observation, not fine analysis or argument." *Perma Greetings, Inc. v. Russ Berrie & Co.,* 598 F.Supp. 445, 447 (E.D. Mo.1984).

Although the test of "substantial similarity" presents a factual issue, "a district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff's work, or when no reasonable trier of facts could find the works substantially similar." *Walker, supra,* 784 F.2d at 48. *See also Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 240 (2d Cir.1983) ("*Warner Bros. II*"); *Perma Greetings, supra,* at 447 ("[s]ummary judgment may be appropriate in a copyright action where a comparison of the copyrighted work and the allegedly infringing work shows that substantial similarity is clearly lacking"); *McMahon v. Prentice–Hall, Inc.,* 486 F.Supp. 1296, 1301 (E.D.Mo.1980). Nevertheless, summary judgment should not be granted if reasonable minds could differ as to the absence of substantial similarity of copyrightable material.[5]

---

5.  In *Arnstein v. Porter,* 154 F.2d 464, 473 (2d Cir.1946), where Ira Arnstein sued Cole Porter

alleging copyright infringement of various songs, the court observed:

"[T]o arrive at summary judgment, a 'side-by-side comparison of the works involved in a copyright infringement action is both proper and appropriate.'" *Perma Greetings*, at 448. Indeed, "[i]n determining copyright infringement, the works themselves supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings." *Walker, supra,* 615 F.Supp. at 434. Additionally, in comparing the Videotapes with the Guide, I must consider the works as they were presented to the public. *Walker,* at 434.

■ In support of their motion the defendants have submitted copies of all three Videotapes (Exhibits D, E, and F), and a copy of *Colorado Winterguide* (Exhibit A). Feder contends that "a side by side comparison of *Colorado Winterguide* and the Videotrip tapes points to a wholesale theft of both the structure and details" from the Guide. He supports this allegation with a transcript of the narration in Video Parts 1 and 2. This transcript is presented alongside the specific portions of the Guide that allegedly were copied (Exhibits G, H, I, and J). With the exception of the plaintiff's Exhibits I and J, which seem superfluous,[6] all of these exhibits have been reviewed thoroughly. It must be noted that while the plaintiff's Exhibits G and H present a transcript of the narration in Videotapes Parts 1 and 2 in the proper sequence, the material from the Guide is not presented in the order in which it appears in the Guide. Defendants object to this arrangement, contending:

"[T]his 'complete line by line comparison' rearranges, recompiles, and restructures the entire context of *Colorado Winterguide* so that it more closely resembles the script of the Videotrip tapes. It is completely disingenuous of the Plaintiff to suggest such "wholesale theft" when the comparison is rigged to the point that the *Colorado Winterguide* portion of the comparisons does not even vaguely resemble the structure, arrangement and compilation of the actual text." (Reply, at 4.)

*See Warner Bros. v. American Broadcasting Cos.,* 654 F.2d 204, 211 (2d Cir.1981) ("*Warner Bros. I*") (disapproving of plaintiff's attempt to demonstrate substantial similarity between the parties' works by altering the actual sequence or construction of the plaintiff's work in order to achieve a juxtaposition that makes for a greater similarity with the defendants' work). Defendants' objection is well-founded, and I have kept in mind that an average observer would not be exposed to Exhibits G and H, but rather the works as they appeared in public.

In an effort to elucidate the manner in which courts have determined whether a similarity is "substantial," Professor Nimmer distinguishes between two types of similarity: (1) "comprehensive nonliteral similarity," and (2) "fragmented literal similarity." 3 M. Nimmer, *supra,* § 13.03[A], at 13–20.1. I find this distinction helpful and accordingly apply it to this case.

### 1. *"Comprehensive Nonliteral Similarity."*

■ According to Professor Nimmer, "comprehensive nonliteral similarity" best describes the situation "where the fundamental essence or structure of one work is duplicated in another." 3 Nimmer, § 13.03[A], at 13–20.1. While comprehensive similarity is present, there is no word

"The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the ear of lay listeners … that defendant wrongfully appropriated something which belongs to the plaintiff.

"Surely, then, we have an issue of fact which a jury is peculiarly fitted to determine. Indeed, even if there were to be a trial before a judge, it would be desirable (although not necessary) for him to summon an advisory jury on this question.

"We should not be taken as saying that a plagiarism case can never arise in which absence of similarities is so patent that a summary judgment for defendant would be correct. Thus suppose that Ravel's 'Bolero' or Shostakovitch's 'Fifth Symphony' were alleged to infringe 'When Irish Eyes Are Smiling.'"

6. Of the four exhibits, I need only consider Exhibits G and H because they provide essentially all of the material used in all three Videotapes. The Videotape transcripts presented in Exhibits I and J merely repeat the language appearing in Exhibits G and H.

for word or other literal similarity. *Id.* If such duplication of structure or essence is literal or verbatim, then clearly substantial similarity results. *Id.* Importantly, the mere fact that a defendant has paraphrased rather than literally copied will not preclude a finding of substantial similarity. *Id.; see also Nichols v. Universal Pictures Co.*, 45 F.2d 119, 121 (2d Cir.1930) (a copyright "cannot be limited literally to the text, else a plagiarist would escape by immaterial variations"). Nonetheless it must be remembered that ideas and facts themselves are not copyrightable.

I have considered the Guide's fundamental essence and structure, and have compared it with that of the Videotapes. The Guide describes 28 Colorado ski areas by discussing them in a nearly alphabetical order, although discussion of some of the resort areas occurs "in a sequential order more useful in terms of their geographical and operational interrelationships." (Guide, at 7.) For example, although the Guide opens with a description of Aspen and ends by discussing Wolf Creek, the discourse on Snowmass, which is located about ten miles from Aspen, follows the discussion of Aspen.

Information for each ski area generally is divided into two categories: "The Mountain" and "The Town (or Village)." The first category is divided into the following subsections: (a) "skiing the Mountain," (b) lift tickets, (c) ski programs, (c) ski rentals, (d) cross-country, and (e) winter activities. The second section discusses: (a) "Getting Around"; (b) lodging; (c) dining; (d) night life; (d) shops; (e) staples; (f) services; and (g) "Getting There." Of special note are the Guide's exhaustive descriptions of the restaurants in each town or village. The Guide closes with a section entitled "Getting through Denver."

Turning to the Videotapes, their structure is as follows: Each Videotape is narrated by Bob Beattie, a well-known ski coach and commentator for ABC's "Wide World of Sports" and the Winter Olympics. Videotape Part 1 describes nine Colorado ski resorts and its sequal describes eight. As mentioned, the third Videotape is a combination of Parts 1 and 2 with duplicative information deleted. Notably, the Videotapes do not discuss the resort areas in the modified alphabetical order employed by the Guide. Rather, Videotape Part 1 describes nine areas (beginning with Steamboat Springs) that are relatively close to Denver, while Part 2 examines eight areas that are at least a five hour drive from Denver.

Each Videotape commences by discussing how to get from Denver's Stapleton International Airport to the ski resorts described in the Videotape. The discussion of each ski area generally addresses the following topics: (1) location of the resort; (2) methods of reaching the resort; (3) the resort's history; (4) statistics regarding the ski mountain's altitude, vertical drop, number of ski lifts and gondolas, *etc.;* (5) various ski trails; (6) other activities in the resort; (7) local restaurants; and (8) available lodging. Interspersed in each of the Videotapes are "tips" on altitude sickness, mountain driving conditions, proper ski attire and equipment, and protection against the elements.

I conclude that an "ordinary observer" would not find the essence and structure of *Colorado Winterguide* and the Videotapes to be substantially similar. First, the works clearly present facts and observations in a different order. For example, while the Videotapes begin the discussion of a particular resort by discussing its location and the best means of travel to reach it, the Guide discusses this topic at the end of each section. Second, the Videotapes only provide a quick overview of the resorts' restaurants, lodgings, and entertainment. This must be contrasted with the Guide's exhaustive treatment of these subjects. Third, as mentioned, the Videotapes present the resorts in a different sequence than that used in the Guide. Fourth, while the Guide obviously was intended as a definitive work on Colorado ski resorts, the Videotapes appear to have been designed to "tease" the viewer into seeking more information about the areas. Additionally, the narration on the Videotapes plays a mere supporting role to the visual presentation of the spectacular scenery, along

with the considerable footage of skiing and other available activities.

Although the Videotapes and the Guide contain some similarities in structure and essence, these are inherent in any travel guides covering the same subjects. *See Cooling Systems, supra,* 777 F.2d at 491 ("the fewer the methods of expressing an idea, the more the allegedly infringing work must resemble the copyrighted work in order to establish substantial similarity"). *See also Durham Industries, Inc. v. Tomy Corp,* 630 F.2d 905, 913 (2d Cir.1980) (in assessing the problems of the relative value to be attributed to some similarities, "as a matter of logic as well as law, the more numerous the differences between the two works, the less likely it is that they will create the same aesthetic impact so that one will appear to have been appropriated from the other"). In summary, I conclude that the "comprehensive nonliteral similarity" standard has not been met.

2. *"Fragmented Literal Similarity."*

■ In explaining "fragmented literal similarity," Professor Nimmer states:

"Where there is literal similarity (virtually, though not necessarily completely word for word) between plaintiff's and defendant's works, the difficult problem [associated with 'comprensive nonliteral similarity'] does not arise. That is, it is not necessary to determine the level of abstraction at which similarity ceases to consist of an 'expression of ideas,' since literal similarity by definition is always a similarity as to the expression of ideas. But suppose the similarity although literal is not comprehensive. That is, the fundamental substance, or skeleton or overall scheme of the plaintiff's work has not been copied.... At what point does such fragmented similarity become substantial so as to constitute the borrowing an infringement?" Section 13.03[A], at 13–35, 36.

"No easy rule of thumb can be stated as to the quantum of fragmented literal similarity permitted without crossing the line of substantial similarity." *Id.* at 13–36, 37. The question in each case "is whether *the similarity relates to matter which consti-tutes a substantial portion of plaintiff's work*—not whether such material constitutes a substantial portion of defendant's work." *Id.* at 13–37 (emphasis added).

Defendants contend that "[t]he few similarities of expression that may exist between the Videotrip Tapes and *Colorado Winterguide* are not a substantial nor an essential portion of Feder's book." (Defendants' brief, at 14–15.) They argue that as a travel aid, the Guide's value and essential purpose are in conveying facts about various ski resorts to readers interested in visiting the resorts. "The value, however well written the book may be, is not in entertaining its readers with original prose." (*Id.* at 14.)

That the Guide primarily contains facts does not preclude copyright protection because the presentation of facts may arise to expression protectible under the Act. For example, in *Southern Bell Telephone and Telegraph Co. v. Associated Telephone Directory Publishers,* 756 F.2d 801 (11th Cir.1985), the court determined that a telephone directory was copyrightable. There, Southern Bell sued a rival telephone directory publisher alleging copyright infringement, and the district court found for Southern Bell. On appeal the Eleventh Circuit recognized that the " 'mere use of the information contained in a directory without a substantial copying of the format does not constitute infringement.' " *Id.* at 810 (citations omitted). Nevertheless, in affirming the decision below the court reasoned that "the renderings of the arranged artwork and listings as well as category headings are 'substantially similar' to those found in Southern Bell's compilation." *Id.* at 811. *See also Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir.1984) (protection afforded to baseball card price guide).

Plaintiff insists, and I agree, that the Guide contains more than mere facts and ideas. Indeed several passages in the Guide showcase its authors' considerable ability to communicate facts and ideas through original expression. The key inquiry is whether the Videotapes copied this original expression in communicating these same facts and ideas. Feder urges that

this question be answered affirmatively, and in addition to the transcripts of the Videotapes that are presented in conjunction with portions of the Guide (plaintiff's Exhibits G through J), Feder's opposition brief details four allegedly "blatant" examples of infringement by the defendants.

One example starts with the following quotation from the Guide, page 188:

"People have been skiing since 1933 when the WPA strung a rope tow up what is now called Gunbarrel just off U.S. 50 on the north side of Monarch Pass. The original wooden towers still stand. Monarch has always been recognized as one of the great natural ski basins in Colorado." (Brief, at 12.)

This passage is compared with the following language from Videotape Part 2:

"Monarch has attracted skiers since the 1930s when the WPA strung up a rope tow on the north side of Monarch Pass. You can still see the original wooden towers. The area is considered one of Colorado's great natural ski basins." (Id.)

Despite Feder's characterization of this comparison as the a "blatant" example of infringement, I conclude that the passage quoted from the Guide fails to constitute "copyrightable" material. Rather it merely states historical and current facts. The phrase "People have been skiing since 1933 when the WPA strung a rope tow up what is now called Gunbarrel just off U.S. 50 on the north side of Monarch Pass" states a historical fact, not a personal observation or other type of protected expression. Similarly, that the original towers still stand is a fact, as is public recognition of Monarch as a superior natural ski basin. It cannot be overemphasized that because factual information is in the public domain and therefore not copyrightable, the defendants had a right as a matter of federal copyright law to avail themselves of facts contained in the Guide and to use such information in the Videotapes.

In introducing another example of purported infringement, Feder's brief quotes page 269 of *Colorado Winterguide:*

"Vail allows each of its guests to feel like they are temporary subjects of this tiny, autonomous principality, as quaint and charming in its own way as Monaco or Liechtenstein. Swoop through the concave powder fields of the Back Bowls, sip Campari from a sun deck as costumed skiers parade by."

Feder compares this passage with the following language from Videotape Part 1:

"Vail truly rivals Europe's most fabulous resorts. Ski the powder of the Back Bowls. Then get ready for apres ski. Enjoy people watching at any one of dozens of outdoor restaurants."[7]

It is plain from the face of the Videotape script that this passage does not copy expression from the Guide. True, both passages describe Vail's "European" atmosphere, along with its great "people watching" at "al fresco" restaurants. Yet these are observations that are too common to be copyrightable. They describe "scenes a faire" of Vail. It is absurd to suggest that after one tourist guide has described these Vail characteristics, subsequent guides are precluded from doing so. The relevant consideration is whether the Videotape expressed these observations about Vail in a manner substantially similar to the plaintiff's expression of these observations. Clearly no "ordinary observer" would find substantial similarity in the works' respective expression of these common observations.

I reach the same conclusion with respect to the other two purportedly "blatant examples" listed in the opposition brief. Moreover, my review and consideration of the Videotapes, the transcript of their narration (plaintiff's Exhibits G and H), and the Guide, requires a similar conclusion with respect to most of the material in the two works. Although there are several overlaps with respect to subject matter, I conclude that these similarities result from

7. Plaintiff's opposition brief also provides a copy of text from Turner's sentence outline regarding this subject. However, as mentioned, *supra*, the court's concern is with the material actually distributed to the public.

mutual use of the same facts, ideas, research, and other nonprotectible information.

However, there are some passages in the Videotapes which do contain expressions practically identical to those used in the *Colorado Winterguide*. Perhaps the best example of probable copying of expression can be found in Videotape Part 1's description of Keystone Mountain. The Videotape states:

> "Skiers from the east may feel right at home in Keystone. There is a certain rounded, forested feeling that you might find in New England. But just look around, and you'll know you're in the Rockies." (Exhibit G, at 31.)

In comparison *Colorado Winterguide* states:

> "Keystone Mountain looks like an eastern mountain—a rounded thoroughly forested mound with myriad trails snaking across its north face. But the setting is most definitely Colorado Front Range." (Book, at 115.)

Although Keystone's geographic characteristics are factual, an "ordinary observer" could easily determine that the Guide's analogy to New England's terrain represented the expression of a personal observation by the Guide's authors, and that the Videotape passage copied that expression.

Another example derives from Videotape Part 1's description of Vail Mountain:

> "Vail is a single mountain with a fairly even distribution of difficulty levels. And with three base areas to provide access to the slopes. With 18 lifts, *any skier can go to the top of the mountain and find a trial back which is suitable to their skills: beginner, intermediate and expert. And while you're at the top, enjoy the magnificent views of the Gore Range.*" (Defendant's Exhibit G, at 16; emphasis added.)

The Guide similarly states:

"Vail is one of those wondrous places where *all skiers*, save the true beginner, *can get to the top, savor the views and the high exhilaration, and come down with that good feeling intact.*" (Page 271; emphasis added.)

Both of these passages communicate a similar observation: that almost any skier at Vail can experience the great feeling of skiing all the way down from the top of the mountain. While certainly not a literal copyright, this is an observation that an "ordinary observer" might (1) deem original by the Guide's authors, and (2) find to have been copied in the Videotape.

Another example comes from Videotape Part 1's use of the term "pamper" to describe the service in the shops and restaurants in Keystone Village. (Exhibit G, at 34.) This is the same term employed by the Guide to describe the resort's "award-winning accomodations and facilities." (Guide, at 113.)

A similar comparison exists in the works' respective descriptions of Winter Park. Videotape Part 1 states:

> "Winter Park has been a long-time favorite of Denver area skiers. The area first opened for skiing in 1928, when the six-mile Moffat Train Tunnel was completed beneath the Continental Divide. *Hearty skiers* trucked up the trails and made about two runs a day, then exhausted, they *retreated to abandoned railroad shacks for warmth and shelter.* The first rope tow was installed in about 1935." (Exhibit G, at 41; emphasis added.)

The Guide contains the following passage:

> "In many respects, Winter Park is the grandfather of Colorado ski areas. It's been a favorite with Denver area skiers for over fifty years. The first *hearty skiers* began arriving by train in 1928 when the six-mile-long Moffat Tunnel running beneath the Continental Divide was completed. Skiers hiked up the slopes and managed about two runs a day, *then retreated to abandoned railroad construction shacks for warmth and shelter.* A rope tow was installed about 1935." (Book, at 315–16; emphasis added.)

It is likely that an "ordinary observer" would find that by using the adjective "hearty," the Videotape copied the Guide's

expression of the idea that the original skiers were vigorous and healthy.

There are other examples. In total, Videotape Parts 1 and 2 contain approximately eight passages that an "ordinary observer" might reasonably consider to be substantially similar to the Guide's expression of the same fact or idea. Yet the inquiry cannot end there. Rather, the next question is whether these incidents of probable copying of protectible expression are substantial enough to be actionable when one considers that they are comparatively few given the overall length of the Videotapes and the breadth of the Guide. Thus the issue is whether these similarities, each of which might in itself be found to be "substantial," appear with sufficient frequency to render the Videotapes in their entirety "substantially similar" to *Colorado Winterguide.*

"The quantitative relation of the similar material to the total material contained in plaintiff's work is certainly of importance." 3 M. Nimmer, *supra*, § 13.03[A], at 13–38. Unfortunately, "no bright line rule exists as to what quantum of similarity is permitted before crossing into the realm of substantial similarity." *Baxter v. MCA, Inc.,* 812 F.2d 421 (9th Cir.1987), *cert. denied,* — U.S. — 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). Even if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity. "In such circumstances the defendant may not claim immunity on the ground of the infringement 'is such a little one.'" Nimmer, at § 12–38, 38.1; *see, also Baxter*, at 425 ("[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity"); *Miller Brewing Co. v. Carling O'Keefe Breweries,* 452 F.Supp. 429, 439 (W.D.N.Y. 1978) ("[a]n infringement of a copyright can be found where only a small portion of a work is copied so long as the part usurped is material and substantial"); *Hig-*

*gins v. Baker,* 309 F.Supp. 635 (S.D.N.Y. 1969) (liability may exist if copied material is qualitatively important even though quantitatively it consists of only .08% of plaintiff's work).[8]

"If, however, the similarity is only as to nonessential matters, then a finding of no substantial similarity should result." 3 Nimmer, at 13–38.1. Thus the courts have applied a *de minimus* standard in ruling that some similarities, while suspect, may be too insignificant to arise to the level of "substantial."

For example, the district court in *Walker, supra,* stated that allegations of the copying of trivial material, even if true, are insufficient to prove substantial similarity of protectible material. 615 F.Supp. at 438. The court added that "[i]n determining infringement, if the points of dissimilarity not only exceed the remaining examples of similarity, but indicate that these slight similarities are of minimal importance either quantitatively or qualitatively, then there is no infringement." *Id.* at 439. *See also Werlin, supra,* 528 F.Supp. 451 (copying two sentences held *de minimus*); *Rokeach v. Avco Embassy Pictures Corp.,* 197 U.S.P.Q. 155 (S.D.N.Y.1981) (copying 100 words out of a total of 70,000 held *de minimus*).

In the instant action I conclude that no "ordinary observer" could find that the Videotapes infringe upon *Colorado Winterguide* within the meaning of the Act. As I concluded, *supra,* the structures of the Videotapes and the Guide are sufficiently different that no similarity can be deemed substantial on this ground. Although eight of the Videotape's passages seem to have copied what appear to be the Guide's protectible expression, I conclude that as a matter of law these similarities are insubstantial when viewed and compared in the overall context of the two works.

There can be little doubt that Turner, in preparing his sentence outline, lifted facts

---

**8.** To suggest that a few lines of verbatim copying in a relatively large work constitutes "substantial similarity," and therefore infringement, seems reminiscent of the pornographer's inclu-

sion of a few lines from Othello into a "skin flick" in order to provide the film "socially redeeming value."

from *Colorado Winterguide*, and that videotrip benefited greatly from the research of Feder and his associates. In several respects this actually appears to be Feder's primary complaint. Yet, as discussed above, that alone does not constitute infringement under the Act. The important fact for purposes of this lawsuit is that the vast majority of information contained in the Videotapes is presented through original expression. While Feder asserts that the differences in language represents the defendants' blatant attempts to conceal their plagiarism, it appears more likely that these differences can be attributed to the dictates of the travel video medium, *i.e.*, the emphasis on letting "the pictures do the talking." Significantly, the vast majority of language in the Videotapes represents neither direct copying nor paraphrasing of the Guide's protectible material. It may discuss the same ideas but it almost always does so with dissimilar expression. Accordingly, the defendants' collective motion for summary judgment must be granted.

## II. *Defendant Romanoski's Individual Motion for Summary Judgment.*

Although I concluded in Part I that the defendants' collective motion for summary judgment must be granted, for purposes of judicial economy I also address the defendant Romanoski's individual motion for summary judgment.

■ A claim for copyright infringement may be asserted against a stockholder or officer of a corporation who is responsible for his corporation's infringing activities. *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 537 (S.D. N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir.1978) ("[a]n individual, including a corporate officer, director or stockholder, who causes a corporate defendant to infringe, or personally participates in the acts constituting infringement, is jointly and severally liable for the infringement").

Liability may be based on the individual's knowledge of and participation in the infringing conduct. *See Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) ("one who, with knowledge of the infringing activity induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer"). However, actual intent to infringe is not necessary for liability under the Act. *Lottie Joplin*, at 537. Thus individual liability may be imposed on a corporate officer who had no knowledge of the infringement, but who had: (1) the right and ability to supervise the infringing activity; and (2) a direct financial interest in such activity. *Id.*

Thus Romanoski may be liable for Videotrip's alleged infringements if he either: (1) had knowledge of any of the alleged infringing activities, and induced or materially contributed to such activity or activities; or (2) had the right and ability to supervise any of the alleged infringing activities, and had a direct financial interest in such activity or activities. I shall address each of these liability theories in the order stated.

### A. Individual Liability Based on Knowledge.

■ Romanoski insists that he "had no involvement with the production of the videotapes, and he had no knowledge of the contents of those videotapes." (Memorandum brief at 7.) In his affidavit submitted in support of his motion, Romanoski asserts: (1) his primary function while employed by Videotrip was in the marketing department; (2) by July 1985 he was not active in Videotrip at all, and his inactivity continued until his August 23, 1985 resignation; (3) he currently owns no stock in Videotrip and has no other financial interest in the company; (4) he had no input into the preparation of any sentence outlines prepared by Videotrip or the final script for the Videotapes prepared by Telemation; (5) at no time did he review the sentence outlines prepared by Videotrip representatives nor the scripts prepared by Telemation for the Videotapes; (6) the Videotapes were distributed subsequent to his resignation; and (7) his only involvement with the Videotapes is that he designed the containers or

boxes for them.[9]

In response, Feder contends that Romanoski is individually liable for the infringement activities because: (1) he was involved in the decision to produce the Videotrip tapes; (2) he attempted to purchase the rights to *Colorado Winterguide* but refused to pay Feder's price; (3) he purchased the guide and gave it to the defendant Turner who was involved with script preparation; (4) he was aware that the script was being written and he met with Turner and the script writer; (5) he had some involvement in production of the tapes; (6) he was aware of Turner's ideas for the script; (7) he accumulated and reviewed the resource materials; (8) he and Turner acted together to decide what materials would be included in the tapes; (9) he knew or should have known that Turner was an accountant, with no experience as an author, and therefore should have investigated whether Turner's work was original; and (10) he did not resign until the tapes were actually in the production stage and voice-over was being done. (Plaintiff's response at 4–5). In support of these allegations Feder has submitted portions of Romanoski's deposition.

■ While Feder has not offered direct proof that Romanoski knew of Videotrip's alleged infringing activities Feder has presented sufficient circumstantial evidence of such knowledge to withstand Romanoski's motion for summary judgment. *See Quintana v. Kudrna,* 157 Colo. 421, 402 P.2d 927, 928 (1965) ("it is within the province of the trier of the fact to draw the inferences of fact from the circumstances present, and reasonable inferences properly deducible from such circumstances will support a judgment based upon them"). Additionally, the fact that Romanoski was the person who initially purchased *Colorado Winterguide* for Videotrip satisfies the requirement that the individual have materially contributed to the infringing activity of another.

### B. Vicarious Liability.

It is undisputed that Romanoski resigned his position with Videotrip in August 1985. This was after production had commenced on Videotape 1 but prior to its distribution. It is also undisputed that while Romanoski was associated with Videotrip, he had a direct financial interest in the Videotapes.

However, there is a genuine dispute of material fact as to whether Romanoski had any supervisory right or authority over the production of the Videotapes. Romanoski asserts that he had no involvement with the creation of the Videotapes, let alone their distribution. (Memorandum brief, at 6.) He states that he "was in the marketing department of Videotrip and was unaware of the actual content of any sentence outlines or scripts produced for the videotapes by Telemation." (Reply brief, at 5.) He adds that "[i]t simply defies credibility to state that [he] was a dominant influence in a corporation which he was no longer associated with as of August 23, 1985 which date precedes the distribution of any of the subject videotapes and the production of two of the tapes." (*Id.* at 5–6.)

■ Whether Romanoski had supervisory authority over the Videotapes' creation presents a factual issue. Nevertheless, the threshold legal issue is whether a corporation's director, officer or shareholder who (1) had no knowledge of infringement activities, and (2) resigns after production of an infringing work but before its distribution, can be held *vicariously* liable for the infringement. I hold that he cannot. If the Videotapes had been created but never distributed, then Feder would not have a colorable claim for infringement. Since Romanoski terminated his relationship with Videotrip prior to distribution of the tapes, he cannot be held vicariously liable as one who had a dominant influence in the corporation at the time the allegedly infringing activities occurred. Importantly, by the time the Videotapes were sold, Romanoski no longer had any financial interest in their sales.

---

**9.** Romanoski also acknowledges that he was involved with the content of the Videotapes in that he gathered information from the ski industry in the summer of 1984. (Reply brief, at 4.)

Nonetheless, because I conclude that Feder adequately has supported his claim that Romanoski knew about the infringing activities, and materially contributed to them, Romanoski's individual motion for summary judgment must be denied. Of course the effect of this determination is rendered moot by my conclusion, *supra,* that the defendants' collective motion for summary judgment must be granted.

### III. *Requests for Attorneys' Fees and Costs.*

In their collective motion for summary judgment, the defendants have requested an award of attorneys' fees and costs incurred in defending this action. (Motion, at 2.) In his brief in opposition to the defendants' collective motion, Feder contends that "the purpose of this motion appears to be one of harassment and wasting the Court's time." (Page 16.) Accordingly, he requests an award of sanctions and attorneys' fees pursuant to Rule 11, Fed.R. Civ.P.

In response, the defendants assert that the plaintiff's request for sanctions and attorneys' fees "is in itself grounds for the imposition of sanctions against Plaintiff and his counsel." (Reply brief, at 9.) Finally, the defendant Romanoski, in his individual motion for summary judgment, requests an award of attorneys' fees and costs incurred in defending this case.

Rule 11, Fed.R.Civ.P., imposes an affirmative duty on judges to enforce sanctions when that Rule has been violated. *Chevron, U.S.A., Inc. v. Hand,* 763 F.2d 1184, 1187 (10th Cir.1985). Rule 11 states in pertinent part:

"The signature of an attorney or party [on a pleading] constitutes a certificate by the signer that ... to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose...."

Although discretion to impose sanctions under Rule 11 should be exercised with care, courts have a duty to apply sanctions in appropriate cases.

An additional deterrent against abuse of the judicial process is found in 28 U.S.C. § 1927. That section provides:

"Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Three substantial requirements must be met before liability may be imposed under § 1927: (1) a multiplication of proceedings by an attorney or other person; (2) by conduct that can be characterized as unreasonable and vexatious; and (3) a resulting increase in the proceedings.

In the present case I am unable to conclude that either the plaintiff or the defendants have violated Rule 11 or § 1927. The respective conduct of these parties and their counsel has been neither unreasonable nor vexatious. Accordingly, the cross-requests for attorneys' fees and costs must be denied.

### IV.

In sum, the defendants' collective motion for summary judgment must be granted. Because the third-party and fourth-party claims for relief derive from the defendant Videotrip's potential liability to the plaintiff, the presence of these claims does not prevent dismissal of the entire action.

Accordingly, for the reasons stated above, IT IS ORDERED that:

(1) Defendants' collective motion for summary judgment is granted;

(2) Alfred T. Romanoski, Jr.'s individual motion for summary judgment is denied;

(3) Defendants' collective request for attorneys' fees and costs is denied;

(4) Alfred T. Romanoski, Jr.'s request for attorneys' fees and costs is denied;

(5) Plaintiff's request for attorneys' fees and costs is denied; and

(6) The complaint and action are dismissed with prejudice.