# United States Court of Appeals
## For the First Circuit

No. 05-2866

T-PEG, INC.; TIMBERPEG EAST, INC.,

Plaintiffs, Appellants,

v.

VERMONT TIMBER WORKS, INC.; DOUGLAS S. FRIANT,

Defendants, Appellees,

STANLEY J. ISBITSKI,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Lynch, and Howard,
Circuit Judges.

Daniel E. Will, with whom Devine, Millimet & Branch, P.A. was on brief, for appellants.
W.E. Whittington, with whom Whittington Law Associates, PLLC was on brief, for appellees.

August 18, 2006

**LYNCH**, <u>Circuit Judge</u>.  This case is the first occasion for us to address a copyright infringement suit under the Architectural Works Copyright Protection Act ("AWCPA"), Pub. L. No. 101-650, §§ 701-706, 104 Stat. 5089, 5133-34 (1990) (codified in scattered sections of 17 U.S.C.), which created a new category of copyrightable subject matter for "architectural works."  17 U.S.C. § 102(a)(8).

The plaintiffs, T-Peg, Inc. and Timberpeg East, Inc. (collectively, "Timberpeg"), sell both architectural designs and the associated packages of material for the construction of timberframed homes.  Timberpeg created architectural plans for a home for Stanley Isbitski in Salisbury, New Hampshire.  The central feature of those plans was the timberframed main house, although the plans did not show a completed final architectural design for the actual timberframe.  The plaintiffs registered their second set of preliminary plans as an architectural work with the Copyright Office, and maintained ownership over the copyright in the work embodied in the plans.

Isbitski, however, never purchased a construction materials package and final plans from Timberpeg.  He did file the registered plans with the Town of Salisbury in order to get a building permit.  Isbitski hired defendant, Vermont Timber Works, Inc. ("VTW"), to erect a timberframe for his home.  VTW erected its

timberframe, but Isbitski never completed his home. A later owner bought the property and completed the home.

Timberpeg filed suit against both Isbitski and VTW, claiming, inter alia, that the timberframe designed through shop drawings and constructed by VTW for Isbitski infringed Timberpeg's copyright in the architectural work. This appeal concerns only the copyright infringement claim against VTW. Isbitski could not be found and was never served.

The district court granted summary judgment to VTW, finding that no reasonable jury could conclude that VTW copied Timberpeg's architectural work, or that VTW's frame was "substantially similar" to Timberpeg's registered plans. The district court also awarded attorneys' fees to VTW.

We reverse the judgment of the district court, finding that there is a genuine issue of material fact as to Timberpeg's copyright infringement claim under the AWCPA. As a result, we also vacate the award of attorneys' fees and remand.

I.

We recount the facts, taking all reasonable inferences in favor of Timberpeg, the party that opposed the entry of summary judgment. See Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 208 (1st Cir. 2006).

Stanley Isbitski owned a plot of land in Salisbury, New Hampshire, on which he wanted to build a home featuring a

"timberframe."  A timberframe is a house frame using wooden posts and beams which remain visible inside the building.  The more common "stick built" home, by contrast, is framed using two-inch lumber rather than posts and beams.  Isbitski dealt both with Timberpeg and with VTW, two companies that are, broadly speaking, in the timberframe business, but have different sorts of operations.  Douglas Friant is one of the founders and co-owners of VTW, and is responsible for the drafting of timberframe shop drawings[1] for VTW.  Isbitski's dealings with Timberpeg and VTW, and his own work on his house (he was acting as his own general contractor for the construction of the home), ran somewhat in parallel.  We describe his dealings with each company separately.

A.        Isbitski's Dealings with Timberpeg

Timberpeg markets and sells designs and its own brand of "packages" for the construction of timberframe homes.  A Timberpeg package consists of the materials used for the construction of a home's timberframe and exterior building envelope (including windows, exterior doors, insulation, siding, exterior trim, and cedar roof shakes).  Timberpeg does not erect the packages it

---

[1] Friant distinguished between "shop drawings," which "deal specifically with the components of the timberframe, their location and their connections," and "architectural plans," which "show the overall scope of the building" and "consist of foundation drawings, first and second floor drawings, elevations, sections, roof plans sometimes, perspectives sometimes."

sells; instead, a customer must hire a builder or contractor to assemble and erect the package.

Timberpeg provides architectural design services for customers, and has a staff of architects and designers who can create all the necessary designs and architectural plans to build a home. Timberpeg's business model is not based on selling design services or architectural plans. Rather, Timberpeg makes its money on the sale of its packages of construction material based on its architectural plans. Timberpeg provides architectural design services as a way to facilitate the sale of its packages.

Sometime in 1999 or perhaps earlier, Isbitski approached Timberpeg to consider the purchase of a Timberpeg package. Isbitski, working with a Timberpeg employee, filled out a "design information sheet" about what he wanted the house to look like. The actual design information sheet is not in the record. On November 15, 1999, Isbitski and Timberpeg entered into a "Deposit Agreement for TIMBERPEG Preliminary Plans and Drawings." Under this deposit agreement, Isbitski paid a $2500 deposit to Timberpeg, in exchange for which Timberpeg would and did create preliminary architectural plans and construction plans for the house. The preliminary architectural plans would consist of a basement plan, floor plans, four elevations (external, vertical views of the house from different angles showing exterior features such as window and door locations, roof pitches, and ceiling heights), and a building

cross section.  After Isbitski's approval of the preliminary plans, Isbitski would receive construction plans, including foundation plans and details of Timberpeg's standard construction techniques. According to the contract, the construction plans could "be used for planning the construction process, ordering materials, obtaining contractor bids, and securing a building permit."  Final plans, which included the complete frame drawings, would not be prepared as part of the deposit agreement, but would be prepared as part of the final contract for the purchase of a Timberpeg package. Timberpeg, in all, provided Isbitski with two versions of the preliminary plans and then construction plans.  No final plans were ever provided.

Under the contract, Isbitski represented to Timberpeg that "any house plans, specifications, drawings or sketches of any kind (the 'Drawings') provided to [Timberpeg were] the result of an original design (the 'Design')," represented that he (Isbitski) was the "sole owner of the Design and has exclusive rights, including copyright, in and to the Design as represented in the Drawings," and agreed to indemnify and hold harmless Timberpeg from use of the drawings and design.  Timberpeg would own the copyright in the "Preliminary Plans, Construction Plans, specifications, drawings, and other material (the 'Plans')."  Isbitski could use the plans "solely in connection with the evaluation and construction of one (1) Package purchased from [Timberpeg]," and

> [a]ny other use of the Plans, including, but not limited to, the following, is an unauthorized appropriation of copyright by Customer and a breach of this Agreement: a) the copying of all or any part of the Plans; b) the utilization or partial utilization of the Plans for the construction of a similar building or structure; or c) any transfer or delivery of the Plans to another person without written authorization from [Timberpeg].

Isbitski was under no obligation to purchase a Timberpeg package after seeing the preliminary plans or even the construction plans. If he chose to purchase a package, the $2500 deposit would be credited against the price of the package. If he chose not to purchase a package, Isbitski would have to return the plans, and Timberpeg would return the deposit minus a fee for design time, billed at $49 per hour, and other incidental costs.

Timberpeg created a first set of preliminary plans on December 29, 1999 and gave them to Isbitski. These plans showed the design of a house with a timberframed main portion and a wing that would be stick built. The record does not contain this first set of plans, and these plans were never registered with the Copyright Office.

In early 2001, Isbitski met again with Timberpeg, saying that he was unsatisfied with the first set of preliminary plans. Timberpeg completed a new design for Isbitski on April 20, 2001 "based on [its] interpretation of Mr. Isbitski's rough ideas and preferences." The plans were given to Isbitski. Timberpeg

registered these plans with the Copyright Office on May 18, 2001. The registration certificate shows that these second preliminary plans were registered as an "architectural work." It is only this second, registered set of preliminary plans that is at issue here.

Based on these plans, Isbitski applied for a building permit from the Town of Salisbury. As part of the permitting process, in April 2001, Isbitski submitted the second preliminary plans to the Town of Salisbury, where they were placed in a public file.

The second set of preliminary plans contained elevations and floor plans. The plans showed a two-floor main house connected via a covered breezeway to a three-car garage with a lofted space above it. The first floor of the main house was nine feet tall; the second floor was eight feet tall. The main house consisted, broadly speaking, of two major portions. One portion -- the portion which would be timberframed -- was backwards-L-shaped. A great room (with two-floor ceilings on the northern end of the house), kitchen, breakfast room, and dining room were on the first floor, and a den was on the lofted second floor (which occupied only the southern portion of the house). The plans for this portion of the house did not contain a complete design of the timberframe, but the floor plans did show where the vertical posts would connect to the foundation and the location of at least some of the internal horizontal beams. The timberframing in this

portion of the house used a particular style featuring common rafters with principal purlins (horizontal timbers supporting the rafters).  The roof in this portion was oriented north-to-south,[2] with a particular pitch (roof angle) referred to as a "twelve-by-twelve" pitch.

The exact dimensions of the timberframed portion of the main house were 44 feet by 28 feet, with a 14-foot-by-8-foot section cut out in the northwest corner to form the L shape, where a screen porch would be located.  There was also a "bump-out" in the kitchen on the western side of the house -- an approximately eight-foot portion of the western wall containing windows that jutted out one foot beyond the rest of the wall.  The timberframed portion of the house also featured a central switchback staircase located in the center of the timberframed portion of the home.  In addition to labels denoting the various rooms, the floor plan showed the location of various fixtures, including a kitchen sink (located at the "bump-out"), a stove, and a fireplace.

The second major component of the main house -- containing bedrooms, bathrooms, and the foyer -- was connected to the eastern side of the timberframed portion, and was to be stick-built.  The roof in this portion of the house was oriented east-to-

---

[2]  The orientations described here may not reflect true physical orientation, but assume that the "vertical" part of the backwards L in the home is pointed north.  All references to the directional orientation of features of the home will make the same assumption.

west, and had a pitch of nine-by-twelve.  There was a covered porch on the northern part of this portion, which connected to the covered breezeway and the three-car garage.

In May 2001, Isbitski asked Timberpeg to modify its preliminary plans so that they reflected a timberframe in a "bent" style rather than the style previously used (which is variously referred to in the record as a "purlin" style or a "purlin with common rafters" style).  He gave Timberpeg a picture clipped from a magazine showing a bent frame (this was the same picture he later gave to VTW).  No modifications were undertaken until the construction plans were drafted.

Later, in August 2001, Isbitski asked Timberpeg for a set of foundation plans showing the location of various support posts and steel girders, so he could start pouring the concrete foundation.  Timberpeg agreed, but asked Isbitski to send in $1500 to cover past due and future design fees.  Timberpeg asserts that it continued to assume that Isbitski would eventually buy a package from Timberpeg.  On September 20, 2001, Timberpeg sent its "construction plans," reflecting a timberframe in a bent-frame style (although not containing a complete frame design), and the foundation plan.  This third set of plans, which reflected the bent frame, was never registered with the Copyright Office.  Sometime thereafter, Isbitski poured the foundation of the home and also began construction of the three-car garage.

B.        Dealings with VTW

In December 2000, a year after Isbitski had seen the first preliminary Timberpeg plans but before Isbitski had asked Timberpeg for a second set of preliminary plans, Isbitski approached VTW. VTW is located in Vermont, and specializes in timberframing. It has no architects on staff, and does not design buildings or create architectural plans. Instead, it uses specifications provided by the customer to create shop drawings of the frame of the building. These specifications typically are in the form of architectural plans, but VTW also can draw frames based on rough sketches, as long as VTW receives information about the building's footprint (the outline of the building as it sits on the ground) and wall height. VTW also has an in-house frame assembly crew that actually erects the frame on site.

According to VTW, Isbitski stated that he had developed a layout for a house plan with his then-deceased wife. Isbitski stated that his plan was to have VTW draw and construct only the timberframe for the timberframed main portion of the home. Isbitski was going to act as the general contractor for the remainder of the home, subcontracting work to other people or companies as needed. Starting at the end of 2000, VTW began drawing a timberframe for Isbitski.

It is undisputed that in his first meeting with VTW in December 2000, Isbitski provided VTW with a copy of the first,

-11-

unregistered set of preliminary plans created by Timberpeg. VTW asserts that its personnel only saw this first set of preliminary plans, not the second, registered plans, on which the claim here is brought. VTW also claims that those first preliminary plans did not even factor into its creation of its timberframe for Isbitski's home because Isbitski said he was unhappy with the plans, and that VTW, in fact, asked Isbitski to consult an architect to develop floor plans and elevations for the home. This, VTW says, would not have been necessary had VTW been relying even on Timberpeg's first, unregistered plans. Timberpeg counters that VTW could have obtained the second, registered preliminary plans, either through Isbitski himself or through the Town of Salisbury. Timberpeg points to a letter written by VTW's attorney after litigation had commenced, which stated that Isbitski asked VTW "to design a frame to fit a portion of the floor plans of his house" and that Isbitski had "represented to [VTW] that he paid for and owned a set of plans, which he provided to [VTW] that were drawn by Timberpeg." The letter does not say whether the plans referred to were the first set or the second set of plans created by Timberpeg.

VTW's position is that it took its directions only from Isbitski and that Isbitski provided substantial guidance in determining VTW's shop drawings of the timberframe. According to Douglas Friant at VTW, Isbitski said that he had been "planning this house for years and [was] working on the design for years."

-12-

At the first meeting in December 2000, Isbitski provided the dimensions of his plan (although the record does not reveal the exact dimensions that he gave to VTW). He also brought pictures clipped from a magazine and a catalog (not from Timberpeg) showing how he wanted the frame to look. The pictures showed a bent-style frame. Friant stated that during the drafting process (starting from December 2000 until May 2002) Isbitski frequently would drop by or call VTW's shop unexpectedly, and would talk with Friant about his ideas about what he wanted for the timberframe. As an example, Friant testified at his deposition that Isbitski was "very concerned about how the stairway looked" and "absolutely emphatic about . . . making sure that he was able to hang a chandelier in the stairway area," and this instruction required Friant to modify the shop drawings. According to VTW, some of Isbitski's instructions were very specific. Isbitski would tell VTW where to place posts within an eighth of an inch, and asked VTW to change the roof pitch in VTW's original designs to a precise pitch he provided. During the time VTW was working on its shop drawings, Isbitski received the second preliminary plans and the construction plans from Timberpeg.

Isbitski agreed to purchase the VTW timberframe on March 8, 2002. By this time, Timberpeg's second preliminary plans, the registered plans, had been in his hands for nearly one year, and publicly available for about the same amount of time. Isbitski

also had had possession of the construction drawings from Timberpeg for nearly six months. VTW completed final revisions to its shop drawings of the timberframe design in May 2002. The shop drawings showed a bent-style frame which was in some ways similar to, and in other ways different from, the timberframed portion of the main house in Timberpeg's registered preliminary plan. We consider these similarities and differences in detail below.

By June 2002, Isbitski had completed the foundation and the three-car garage with the loft. VTW erected, on that foundation, the frame as provided for in the shop drawings. The parties assume that the erected frame reflected the shop drawings.

In September 2002, Isbitski informed Timberpeg that he was not going to be purchasing a Timberpeg package. According to Timberpeg, Isbitski said the reason was that he was going to build a stick-built, rather than a timberframed, house. Timberpeg in response asked for the remainder of the design fees due (which fees had, by that point, exceeded Isbitski's total deposit), amounting to approximately $1000. It is unclear whether Isbitski ever paid this amount. Soon thereafter, Timberpeg learned that Isbitski was building a house, using VTW's timberframe, that looked like the house it had designed.

C.      The Aftermath

Isbitski never completed the home, apparently because he ran into financial difficulty. Isbitski had begun enclosing the

-14-

timberframe built by VTW with exterior wall panels, but never completed that task, and the frame was left open to the elements. Timberpeg sold a license to its registered design to Sugar River Savings Bank in October 2003 in order to assist with the completion of construction of the home. Under the terms of the license, the bank was free to re-sell to any party other than Isbitski or VTW. Sometime in 2004, a representative from Timberpeg visited the Isbitski site. The property had been purchased by a Mr. Dupee, who had largely completed construction of the house in a manner which, according to Timberpeg, was similar to the design as reflected in the second set of preliminary plans created for Isbitski.

## II.

Timberpeg filed suit against VTW and Isbitski in the U.S. District Court in New Hampshire on October 23, 2003. Timberpeg asserted, inter alia, copyright infringement claims against VTW under 17 U.S.C. §§ 501 et seq. Timberpeg's claim against VTW was that the timberframe designed in shop drawings and built by VTW was "substantially similar to the architectural work embodied in the" second preliminary plans, which it had registered as an architectural work.[3]

---

[3] After having been unable to locate and effect service upon Isbitski, Timberpeg voluntarily dismissed its claims against him without prejudice. Timberpeg later amended its complaint to add Friant as a defendant.

On February 9, 2005, the district court granted summary judgment to VTW on all counts. As to the copyright infringement claim, the district court first held, incorrectly relying on pre-AWCPA law, that VTW's constructed frame could not be a copy of an architectural plan under copyright law. The district court, considering only whether VTW's shop drawings were an infringing copy of Timberpeg's architectural work, as embodied in the second preliminary plans, held as a matter of law that VTW had not actually copied Timberpeg's plans, and even assuming copying, that VTW's shop drawings were not substantially similar to Timberpeg's architectural plans.

Timberpeg moved for reconsideration, pointing out that its claim was based on the AWCPA. It argued that the district court's holding that a building could not be a copy of an architectural plan under copyright law was contrary to the AWCPA.[4] It also argued that there was at least a genuine issue of material fact as to unlawful copying. Timberpeg relied, in part, on the letter from VTW's counsel, which it argued contained an admission that the defendants had copied Timberpeg's plans. Timberpeg emphasized that its "central theory . . . is that the timberframe, in the shop drawings and as constructed by the defendants[,] is an infringing copy of the architectural work reflected in Timberpeg's

---

[4] VTW, in response, agreed that the district court erred in concluding that a building could not infringe an architectural work as embodied in an architectural plan.

copyright[ed] architectural plans, as opposed to an infringing copy of the plans themselves" and that the claim squarely fell under the AWCPA.[5]

The district court reconsidered, and on April 6, 2005, held that no reasonable jury could conclude that the timberframe as constructed according to VTW's shop drawings was substantially similar to the architectural work as embodied in Timberpeg's registered plans. In doing so, it rejected Timberpeg's reliance on the letters from VTW's counsel.

VTW moved for attorneys' fees under the Copyright Act, 17 U.S.C. § 505. The district court granted VTW's motion for attorneys' fees and awarded $116,642.43.

III.

Before turning to the specific arguments on appeal, we discuss the governing framework of copyright law and the AWCPA. The AWCPA extended copyright protection to a class of works called "architectural works," 17 U.S.C. § 102(a)(8), which are defined as

> the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

---

[5] It is undisputed that Timberpeg's second preliminary plans were created after the effective date of the AWCPA. See AWCPA § 706, 104 Stat. at 5134 (codified at 17 U.S.C. § 102 note).

-17-

17 U.S.C. § 101.  Timberpeg argues that this definition is broad, and that VTW's timberframe (as reflected in the shop drawings and as constructed) infringes Timberpeg's copyright in the architectural work as embodied in its second, registered preliminary plans and including a particular configuration of elements which together form the work.

We first briefly lay out the requirements of a claim of copyright infringement.

A.      Copyright Infringement

Under the Copyright Act, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(a).  An "architectural work" is a work of authorship.  Id. § 102(a)(8).  A copyright holder has certain exclusive rights to the work, including the right to reproduce all or any part of the copyrighted work.  Id. § 106; see also Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005).  One infringes a copyright when he or she violates one of the exclusive rights to a work held by a copyright owner, and the owner has the right to sue for infringement.  See 17 U.S.C. § 501.

"To establish copyright infringement under the Copyright Act, 'two elements must be proven: (1) ownership of a valid

-18-

copyright, and (2) copying of constituent elements of the work that are original.'" Johnson, 409 F.3d at 17 (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)); see also Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001); Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000). Proving "copying of constituent elements of the work that are original" (the second element of the Feist test) itself involves two steps: the plaintiff must show (a) that the defendant actually copied the work as a factual matter, either through direct evidence or through indirect means, see Yankee Candle Co., 259 F.3d at 33; Segrets, 207 F.3d at 60, and (b) that the defendant's "copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar,'" Johnson, 409 F.3d at 17-18 (quoting Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 813 (1st Cir. 1995), aff'd by an equally divided court, 516 U.S. 233 (1996)).

In an infringement action, the burden is on the plaintiff to prove these elements. Id. VTW does not challenge Timberpeg's ownership of a valid copyright in this case. This leaves the question of whether VTW "cop[ied] constituent elements of the work that are original." Feist, 499 U.S. at 361.

B.      The Architectural Works Copyright Protection Act

Historically, copyright law provided limited protection to works of architecture. Architectural plans, while not

explicitly mentioned in the Copyright Act of 1976, were covered under a provision affording protection to "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5); see also 1 Nimmer & Nimmer, Nimmer on Copyright § 2.08[D][2][a], at 2-117 (2006) (discussing legislative history of Copyright Act of 1976). But architectural structures themselves were afforded virtually no protection. See 1 Nimmer & Nimmer, supra, § 2.08[D][2][b], at 2-126; Ginsburg, Copyright in the 101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990, 14 Colum.-VLA J.L. & Arts 477, 490 (1990).

This began to change with the accession of the United States to the Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as last revised July 24, 1971 and amended Sept. 28, 1979, S. Treaty Doc. No. 99-27, 1161 U.N.T.S. 30. The Berne Convention requires protection for "works of . . . architecture" as distinct from "illustrations, maps, plans, sketches and three-dimensional works relative to . . . architecture." Id. art. 2. The United States joined the Berne Convention with the passage of the Berne Convention Implementation Act of 1988 ("BCIA"), Pub. L. No. 100-568, 102 Stat. 2853 (1988). While the BCIA amended the definition of "pictorial, graphic, and sculptural works" to explicitly include "architectural plans," id. § 4 (codified at 17 U.S.C. § 101), it did not explicitly extend

-20-

protection to "architectural works," as distinct from architectural plans.

To ensure United States' compliance with the requirements of the Berne Convention, the AWCPA was signed into law on December 1, 1990. Pub. L. No. 101-650, §§ 701-706, 104 Stat. 5089, 5133-34 (codified in scattered sections of 17 U.S.C.); see also H.R. Rep. No. 101-735 (1990), reprinted in 1990 U.S.C.C.A.N. 6935. The AWCPA added "architectural works" as a new category of copyrightable works. 17 U.S.C. § 102(a)(8). The legislative history makes it clear that "[p]rotection for architectural plans, drawings, and models as pictorial, graphic, or sculptural works under section 102(a)(5) . . . is unaffected by" the AWCPA. H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6950.

The definition of an "architectural work," 17 U.S.C. § 101, quoted in full above, has three main components. First, an "architectural work" is the "design of a building as embodied in any tangible medium of expression." Id. The definition provides three exemplars of such a tangible medium of expression -- "a building, architectural plans, or drawings" -- although these are not the only possible media of expression. Id. As originally drafted, the bill only referred to architectural works as embodied in buildings. H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6950. According to the legislative history for the AWCPA, "there was concern that a defendant with access to the plans

-21-

or drawings could construct an identical building but escape liability so long as the plans or drawings were not copied." Id. To close this potential gap, the bill was reworded to expand the definition of an architectural work to encompass a building design "as embodied in any tangible medium of expression." Id.

This more expansive definition means that the holder of a copyright in an architectural plan (such as Timberpeg) has two forms of protection, one under the provision for an "architectural work" under 17 U.S.C. § 102(a)(8), and another under the provision for a "pictorial, graphical, or sculptural work" under 17 U.S.C. § 102(a)(5). The legislative history confirms this point. See H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6950 ("An individual creating an architectural work by depicting that work in plans or drawing will have two separate copyrights, one in the architectural work (section 102(a)(8)), the other in the plans or drawings (section 102(a)(5)).") The two avenues of protection are slightly different in scope, as discussed below. As Timberpeg made clear in its motion for reconsideration before the district court, its "central theory" is based on the protection afforded architectural works under § 102(a)(8) rather than the protection afforded architectural plans under § 102(a)(5).

The second component of the definition is that an architectural work "includes the overall form as well as the

arrangement and composition of spaces and elements in the design."

17 U.S.C. § 101. According to the legislative history,

> [t]he phrase 'arrangement and composition of spaces and elements' recognizes that: (1) creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole; (2) an architect may incorporate new, protectible design elements into otherwise standard, unprotectible building features; and (3) interior architecture may be protected.

H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6949.

Finally, the definition excludes from the protectable "architectural work" "individual standard features." 17 U.S.C. § 101. The legislative history provides examples of such individual standard features: "common windows, doors, and other staple building components." H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6949. Non-standard individual features reflecting some amount of originality are not necessarily excluded from copyright protection. Id. Furthermore, while individual standard features may not be individually copyrightable, as the quoted legislative history above confirms, the combination of such standard features may be copyrightable. Id.

Under the Copyright Act, architectural works are, in at least one sense, "subject to a standard of copyrightability more generous than that accorded pictorial, graphic or sculptural works." Ginsburg, supra, at 491. Under 17 U.S.C. § 101,

-23-

> pictorial, graphic, and sculptural works . . .
> include works of artistic craftsmanship
> insofar as their form but not their mechanical
> or utilitarian aspects are concerned; the
> design of a useful article, as defined in this
> section, shall be considered a pictorial,
> graphic, or sculptural work only if, and only
> to the extent that, such design incorporates
> pictorial, graphic, or sculptural features
> that can be identified separately from, and
> are capable of existing independently of, the
> utilitarian aspects of the article.

Id. (emphasis added). The requirement that the protectable elements of a pictorial, graphic, or sculptural work be separated from the "utilitarian aspects" of the work under 17 U.S.C. § 102(a)(5) is known as the "separability test." By contrast, there is no separability test for an architectural work. In the AWCPA, Congress purposefully did not impose such a separability test for determining the copyrightability of architectural works. See H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6951 ("[T]he copyrightability of architectural works shall not be evaluated under the separability test applicable to pictorial, graphic, or sculptural works.").

IV.

We review the district court's entry of summary judgment de novo. Senior, 449 F.3d at 216. "Summary judgment is proper only if the record, read favorably to the non-moving party, reflects no genuine issues of material fact and the undisputed facts indicate that the movant is entitled to judgment as a matter

-24-

of law." Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Fed. R. Civ. P. 56(c)).

On appeal, the arguments center around whether there is a genuine issue of material fact as to substantial similarity. The district court, at least in its first order, also concluded that no reasonable jury could conclude that VTW had actually copied Timberpeg's plans. Since copying is a necessary element of a copyright infringement claim, see Johnson, 409 F.3d at 17-18, we would uphold summary judgment if the district court were correct on this ground, and we may affirm on any ground supported by the record, see Senior, 449 F.3d at 216. We briefly discuss the evidence of copying and conclude that the district court was not correct.

A.      Actual Copying

Copying may be proven through direct or circumstantial evidence. Johnson, 409 F.3d at 18. Timberpeg points both to direct and to circumstantial evidence of copying, sufficient to create a material issue of fact for a jury.

For direct evidence, Timberpeg points to the letter from VTW's attorneys stating that Isbitski "represented to [VTW] that he paid for and owned a set of plans, which he provided to [VTW] that were drawn by Timberpeg." Timberpeg argues that this letter is an admission by VTW that it relied on the registered preliminary plans. VTW, like the district court, rejects Timberpeg's reliance

-25-

on the letters, arguing that the letters were not admissions, but to the contrary, state that VTW did not copy Timberpeg's plans. The letter from VTW's attorney does not say whether the plans referenced are the second, registered preliminary plans (about which there is a dispute as to whether VTW saw the plans) or the first, unregistered preliminary plans (which VTW acknowledges it received, but states it did not rely on). This is a factual dispute about the meaning of the admission by counsel, and that issue cannot be resolved on summary judgment.

In the absence of direct evidence of copying -- such direct evidence is rare, see Johnson, 409 F.3d at 18 -- one of the ways to indirectly establish that the defendant copied the plaintiff's work is to provide evidence that (1) the defendant "enjoyed access to the copyrighted work," and so had the opportunity to copy the work, and (2) "a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying." Id. The similarity inquiry used to indirectly establish copying is referred to as "probative similarity" and is "somewhat akin to, but different than, the requirement of substantial similarity" that must be shown to prove copyright infringement. Id.

As to access, Timberpeg argues that VTW had access to its registered preliminary plans both because Isbitski had made those plans public by filing them with the Town of Salisbury, and because

VTW could have received the plans directly from Isbitski. A trier of fact may impute access when there is "evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work," and the "plaintiff's and defendant's dealings took place concurrently." 4 Nimmer & Nimmer, supra, § 13.02[A]. That is the case here.

As to whether there is a genuine issue of material fact as to "probative similarity" -- whether "a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying" -- this analysis merges somewhat with the question of "substantial similarity" (although they are separate questions). We discuss below the similarities and dissimilarities between Timberpeg's registered plans and VTW's frame in the context of the substantial similarity inquiry. We conclude that a reasonable jury could find a sufficient degree of probative similarity exists between Timberpeg's architectural work and VTW's frame "to give rise to an inference of actual copying" for the same reasons a jury could find there is substantial similarity.

B.      Substantial Similarity

The substantial similarity inquiry "entails proof that the copying was so extensive that it rendered the works so similar that the later work represented a wrongful appropriation of expression." Johnson, 409 F.3d at 18. The inquiry focuses not on

-27-

every aspect of the copyrighted work, but on those "'aspects of the plaintiff's work [that] are protectible under copyright laws and whether whatever copying took place appropriated those [protected] elements.'"  Id. at 19 (second alteration in original) (quoting Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir. 1998)); see also Feist, 499 U.S. at 361 (noting that wrongful copying requires showing of "copying of constituent elements of the work that are original" (emphasis added)).  Summary judgment on substantial similarity is "unusual" but can be warranted on the right set of facts.  See Segrets, 207 F.3d at 62.  "Summary judgment on [substantial similarity] is appropriate only when a rational factfinder, correctly applying the pertinent legal standards, would be compelled to conclude that no substantial similarity exists between the copyrighted work and the allegedly infringing work." Johnson, 409 F.3d at 18.

The copyrighted work at issue is Timberpeg's architectural work as embodied in the second preliminary plans. As for the allegedly infringing works, there are both VTW's shop drawings and the frame as actually erected by VTW.  The parties have assumed that the frame as erected matches VTW's shop drawings. VTW's shop drawings also reflect certain other features that VTW did not actually build -- the exterior walls and the actual staircase (although VTW did build the posts that define the stair

bay).    We  include  these  features  as  part  of  the  allegedly infringing work when conducting the similarity analysis.

Substantial  similarity  can  be  measured  by  the  "ordinary observer"  test.  Id.  Under  that  test,  two  works  will  be  said  to  be substantially  similar  if  a  reasonable,  ordinary  observer,  upon examination  of  the  two  works,  would  "conclude  that  the  defendant unlawfully  appropriated  the  plaintiff's  protectable  expression." Id.  The  two  works  need  not  be  exact  copies  to  be  substantially similar.  Differences  between  the  works  have  some  effect  on  the inquiry,  but  the  mere  existence  of  differences  is  insufficient  to end  the  matter  in  the  defendant's  favor.  Id.; see also Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 608 (1st Cir. 1988) ("Slight  or  trivial  variations  between  works  will  not preclude  a  finding  of  infringement  under  the  ordinary  observer test.").  "If  the  points  of  dissimilarity  not  only  exceed  the points  of  similarity,  but  indicate  that  the  remaining  points  of similarity  are,  within  the  context  of  plaintiff's  work,  of  minimal importance,  either  quantitatively  or  qualitatively,  then  no infringement  results."  4 Nimmer & Nimmer, supra, § 13.03[B][1][a].

The  record  shows  the  following  similarities  between  VTW's shop drawings and Timberpeg's registered plans:
1.  VTW's  shop  drawings  and  the  frame  as  constructed  had  a backwards-L-shaped  footprint  with  exactly  the  same  dimensions  as the  timberframed  portion  of  the  main  house  in  Timberpeg's  plans.

2.  VTW's shop drawings and the constructed frame had a kitchen "bump-out" along the western wall, although the VTW bump-out was about two feet wider than the one in Timberpeg's plans.

3.  VTW's shop drawings showed a central switchback staircase in precisely the same location as the staircase in Timberpeg's plans, and the constructed frame included the posts used to define the stair bay.

4.  VTW's frame showed a lofted second floor in the same location and with the same dimensions as in Timberpeg's plans.

5.  VTW's frame had the same roof pitch and dimensions as in Timberpeg's plans.

6.  The plate (wall) height was the same in both Timberpeg's plans and VTW's shop drawings.

7.  VTW's shop drawings appeared to contemplate a further wing attached to the eastern wall of the timberframe; the shop drawings showed the location of exterior wall panels (which VTW would not erect but were nonetheless reflected in the drawings), and there were no such panels along the eastern side.  The Timberpeg plans showed a separate stick-built wing attached to the eastern side of the timberframed portion of the home.

VTW and the district court pointed to a number of differences shown in the record between VTW's shop drawings and Timberpeg's registered plans:

1. VTW asserts that its frame was able to support any number of designs, depending on how the panels and walls were applied to the frame, while the Timberpeg design showed a particular internal floor plan and external features. Timberpeg acknowledges that the frame was not determinative, but points out that VTW's frame could accommodate Timberpeg's whole house design (if one chose to do so).

2. Timberpeg's registered plans did not show a complete timberframe design, while VTW's shop drawings showed only a timberframe, and VTW only erected a timberframe.

3. The frame components that were shown in Timberpeg's second, registered preliminary plans reflected a certain framing style with common rafters and principal purlins,[6] while VTW's shop drawings and frame were in a bent style.

4. While Timberpeg's plans and VTW's frame both had 27 posts, there are differences. There were two posts in the VTW shop drawings without any corresponding equivalents in the Timberpeg design. Of the twenty-five equivalent posts, only two were identical in size, orientation, notching, and location.

VTW argues that these differences "preclude[] the existence of a material dispute on whether there was 'substantial similarity.'" Timberpeg argues that all of these differences are

_____

[6] The Timberpeg construction plans showed a bent frame but were not registered with the Copyright Office.

minimal, and are insufficient to overcome the similarities such that summary judgment for VTW is warranted.

Keeping in mind the definition of an "architectural work" as "includ[ing] the overall form as well as the arrangement and composition of spaces and elements in the design," 17 U.S.C. § 101, we conclude that there are genuine issues of material fact as to substantial similarity.

The district court erred in failing to consider those similarities that went to the "overall form" of the building as well as the "arrangement and composition of spaces and elements."[7] The district court found that the only similarities were in "the idea of a twenty-eight by forty-four foot part of a house, with a stair bay located in a particular position"[8] and so found that no

---

[7] "The extent to which the [copyrighted work] contain[s] protected expression is a matter of law, determined by the court. Once this determination is made, the question of whether two works are substantially similar (and corresponding application of the ordinary observer test) is a matter for the trier of fact unless summary judgment is proper." Yankee Candle Co., 259 F.3d at 34 n.5.

[8] The district court referred to the "idea/expression" dichotomy in copyright law. "It is axiomatic that, while 'no author may copyright his ideas or the facts he narrates,' an author may copyright the expression of those ideas." John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 42 (1st Cir. 2003) (quoting Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556 (1985)). Drawing the line between an idea and the expression of that idea can be difficult. As Judge Learned Hand recognized, "Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc." Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960). Regardless of whether a house of certain

reasonable jury could conclude that VTW's shop drawings were substantially similar to Timberpeg's registered plans.

In fact, the relevant similarities here go beyond those recognized by the district court.  At issue here is a particular combination of elements in Timberpeg's architectural work: a portion of a home featuring a timberframe with a backwards-L-shaped footprint, with a particular arrangement of posts, with certain dimensions and a bump-out along the western wall, featuring a central switchback staircase, with a lofted second floor of a certain floor area and in a certain location, with a certain roof pitch with certain dimensions, and certain wall heights.  A reasonable jury, properly considering this combination of elements, could conclude that VTW's frame was substantially similar to Timberpeg's registered plans.

The district court also concluded that the differences between VTW's frame and Timberpeg's registered plans were such that no reasonable jury could conclude there was substantial similarity.  We disagree.

The district court and VTW emphasized that VTW designed only a frame, while Timberpeg's plans did not contain a complete frame design.  This emphasis wrongly assumes that the only question here is whether a reasonable jury could conclude that VTW's frame

_____

dimensions with a central staircase might be regarded as an idea, the combination of elements at issue here go beyond an idea into the realm of expression.

is substantially similar to Timberpeg's <u>frame design</u>, and that since Timberpeg never designed a complete frame, there can be no infringement. That is wrong. The question here is whether a reasonable jury could conclude that VTW's frame as drawn and built is substantially similar to Timberpeg's <u>architectural work</u> (which includes "the overall form as well as the arrangement and composition of spaces and elements in the design") as embodied in the second preliminary plans for the Isbitski house. This does not necessarily turn on whether Timberpeg created a complete frame design or not.[9]

As to VTW's claim that it is a dispositive difference that the VTW frame could accommodate any number of internal layouts and external features other than those reflected in the

---

[9] VTW might be understood to be making a slightly different argument as well: that under 17 U.S.C. § 101, an architectural work is the "design of a building" and that because the VTW frame is not a "building" and Isbitski never completed the "building," then VTW's frame is not an "architectural work" and cannot be substantially similar to Timberpeg's architectural work. The predicates of this argument are shaky, but the more fundamental problem is that the statute does not require that the <u>infringing</u> work meet the definition of an architectural work. For instance, the AWCPA excludes from the scope of exclusive rights in architectural works "the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place." Pub. L. No. 101-650, § 704, 104 Stat. at 5133 (codified at 17 U.S.C. § 120); <u>see</u> <u>generally</u> <u>Leicester</u> v. <u>Warner Bros.</u>, 232 F.3d 1212 (9th Cir. 2000) (discussing this exception). Such a specific carve-out for works that are not architectural works weighs strongly against any argument that only architectural works can be infringing.

architectural plans created by Timberpeg, this too stems from a misunderstanding of Timberpeg's claim. Copyright protection exists not only in the architectural work taken as a whole (which includes a particular floor plan and arrangement of external features), but also in protectable portions of the work. Timberpeg bases its claims here on a combination of elements, which, taken together, are protectable under the definition of an architectural work in 17 U.S.C. § 101. As the legislative history for the AWCPA states, "[t]he phrase 'arrangement and composition of spaces and elements' recognizes that . . . creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole." H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6949. A jury could reasonably conclude that VTW's frame is substantially similar to these protectable elements of Timberpeg's architectural work. The fact that VTW's frame might not necessarily result in other elements being taken from Timberpeg's architectural work is not dispositive.

VTW also considers the differences in the posts between Timberpeg's plan and VTW's frame to be dispositive. This is an argument that can be addressed to the jury, but is not itself dispositive on summary judgment. Timberpeg argues that differences in almost all of the posts are measured on the scale of inches rather than feet. VTW has not argued that Timberpeg is wrong on

this point, and has not demonstrated that no reasonable jury would find the differences insignificant. VTW makes general statements that certain posts have a different size, orientation, or notching, but the actual measure of the differences is important to evaluating substantial similarity; a difference of a few feet obviously weighs more strongly against substantial similarity than a difference of a few inches. Both the magnitude and significance of any differences present disputed issues of material fact that cannot be resolved on summary judgment.

VTW also relies on the difference in the size of the kitchen bump-out and the fact that Timberpeg's second preliminary plan contemplated a common rafter style, whereas the VTW frame featured a bent style. While these differences may also weigh against a finding of substantial similarity by the fact finder, this is evidence for the jury to weigh.

This analysis alone requires reversal. We also comment on one other point to give guidance to the district court and to clarify an earlier decision of ours.

Timberpeg and VTW both introduced reports prepared by expert witnesses. The district court rejected any reference to expert affidavits in the context of substantial similarity, citing our Segrets case.[10] We have not, however, uniformly rejected the

---

[10] In Segrets, we noted in a footnote in dicta the rule that "[w]hile expert testimony may be used to establish that there was copying . . ., where factual copying has been established, as here,

use of expert testimony on substantial similarity.  See Johnson, 409 F.3d at 20 (noting that the plaintiff's "burden of establishing both probative similarity . . . and substantial similarity . . . [are] dependent on three purported similarities (points one, two, and seven in Mr. John's [expert] report)").[11]  Moreover, the need for expert testimony may be greater in cases involving complex subject matters where an ordinary observer may find it difficult to properly evaluate the similarity of two works without the aid of expert testimony.  As Nimmer notes, "[a] special challenge is posed in adjusting the traditional categories of substantial similarity to the burgeoning areas of technology protected by copyright."  4 Nimmer & Nimmer, supra, § 13.03[E][4].

We leave to the district court the determination of whether this may be a case in which expert testimony would be helpful on the issue of substantial similarity.  We also note that the district court did not determine whether the expert reports otherwise met applicable standards for admissibility, see Fed. R. Evid. 702, 703, and we do not address this issue.  If admissible, the conflicting reports indicate material issues of fact as to substantial similarity.  Timberpeg's expert (who was also a

there should be no expert testimony to establish whether or not there was substantial similarity."  207 F.3d at 66 n.11.  In this case, factual copying has not been established, and expert testimony is at least admissible for that purpose.

[11] Johnson was decided after the district court issued its decisions in this case.

-37-

Timberpeg employee) stated that "the outline and design of the Isbitski house in the [VTW] drawings matches almost exactly the architectural design represented in Timberpeg's plans" and that "the overall dimensions are the same, the stair is the same design in the same location, and the area shown as a loft is the same size in the same location." VTW's expert report, by contrast, noted a number of differences, including the fact that the VTW frame was a bent frame rather than a frame using common rafters with purlins as in Timberpeg's plans. It also noted that the VTW posts were placed on basement "footings" that were already in place when the frame was constructed.

V.

The issue of whether VTW's shop drawings and constructed frame were substantially similar to Timberpeg's architectural work as embodied in the second preliminary plans for the Isbitski home is one for a jury to decide after trial. At present there are genuine issues of material fact both as to copying and as to substantial similarity, making the question one that cannot be resolved on summary judgment.

We <u>reverse</u> the entry of summary judgment against Timberpeg, <u>vacate</u> the attorneys' fee award, and <u>remand</u> for further proceedings consistent with this opinion. Costs are awarded to T-Peg, Inc. and Timberpeg East, Inc.