**SITUATION MANAGEMENT SYSTEMS, Plaintiff,**

v.

**ASP CONSULTING GROUP, Defendant.**

**Civil Action No. 06–11557–WGY.**

United States District Court, D. Massachusetts.

Feb. 28, 2008.

William F. Dolan, Jones Day, Chicago, IL, Ryan C. Siden, Siden & Associates, PC, Boston, MA, for Plaintiff.

James J. Foster, Laura E. Topper, Wolf, Greenfield & Sacks, PC, Boston, MA, for Defendant.

## FINDINGS AND RULINGS

YOUNG, District Judge.

Situation Management Systems ("SMS") and ASP Consulting Group ("ASP") compete to provide corporations and individuals with strategies for effective communication and negotiation in the workplace. *See* Pl.'s Mem. Supp. Summ. J. [Doc. No. 39] at 3–4. To that end, both companies offer workshops designed to "improv[e] business and personal productivity." *See* Compl. [Doc. No. 1] ¶¶ 1–4. SMS brought this suit claiming that ASP infringes the copyrighted workbooks and training materials distributed in connection with three of its workshops. *See* Compl. ¶ 8.

After the Court denied cross-motions for summary judgment, [Doc. Nos. 36, 38], the parties agreed to treat the matter as a case stated. "In a case stated, the parties waive trial and present the case to the court on the undisputed facts in the pretrial record." *TLT Constr. Corp. v. RI, Inc.,* 484 F.3d 130, 135 n. 6 (1st Cir.2007). "[T]he Court must review the record, draw reasonable inferences, apply the governing law, and enter such judgment as may be appropriate." *Heller v. Cap Gemini Ernst*

*& Young Welfare Plan*, 396 F.Supp.2d 10, 18 (D.Mass.2005).

Exercising jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, this Court rules that ASP copied SMS's materials, but that ASP is not liable for infringement because the accused works are not substantially similar to the originals.

## I. BACKGROUND

The backdrop to this suit is a bitter struggle between a company and its former employees. In 2001, SMS declared bankruptcy and emerged that same year with new ownership, which restructured the company and terminated the employment of two of SMS's former leaders, Dane Harwood and Alex Moore. Compl. ¶ 10; Pl.'s Mem. Supp. Summ. J. ¶ 8. Harwood and Moore, who had helped create SMS's workshops, went on to became two of ASP's founders. *Id.* ¶¶ 5, 9. Harwood and Moore helped develop the three accused works, *Communicating 2 Influence*, *Championing Ideas*, and *Negotiating Successful Agreements*, which are basically workbooks consisting of anywhere from eighty to hundreds of pages apiece. Pl.'s Concise State. Mat. Facts [Doc. No. 41] ¶ 9.

Comprised of text, flow charts, exercises, and surveys for self-assessment, the materials focus on developing skills associated with promoting one's influence inside an organization, promoting ideas within a business, and successful negotiation. *Id.* ¶ 3. Three of SMS's products, *Positive Power & Influence*, *Positive Negotiation Program*, and *Promoting and Implementing Innovation*, focus on the same topics. *Id.* SMS alleges that these and other similarities amount to infringement.

## II. COPYING

 SMS seeks to prove infringement by demonstrating that ASP copied the three workbooks. In order to prove infringement by copying, a plaintiff must first demonstrate that the defendant used the plaintiff's work "as a model, template, or even inspiration" in creating its own and that the new work is substantially similar to the original. *See* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, § 13.01[B] (footnotes omitted), at 13–8 (2007).

SMS has satisfied the first part of the inquiry. It is undisputed that Harwood and Moore had intimate familiarity with SMS's programs because they helped write them. See Harwood Decl. [Doc. No. 43] ¶ 3. Moreover, Harwood, Moore, and at least one other ASP employee had access to SMS's works during the period when they generated the accused works. *See* Harwood Dep. Tr., August 22, 2007 [Doc. No. 47], 107–12. The fact that ASP's works address the same topics as SMS's is not a matter of coincidence. In addition, the speed with which SMS's former employees were able to generate ASP's new materials underscores that they did not start from scratch. For example, ASP developed *Communicating 2 Influence* in between 6 and 34 days. Harwood Dep. Tr., August 23, 2007 at 232. The Court therefore finds that the creators of ASP's programs used SMS's materials in creating their own.

Nevertheless, "the question still remains whether such copying is actionable." NIMMER, *supra*, § 13.01[B] (footnotes omitted); *see also Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (holding no actionable infringement occurred despite the undisputed fact that defendant copied 1,309 phone listings without permission because listings not copyrightable). In order for the copying to give rise to infringement liability, SMS must prove that ASP's works are "substantially similar to [its own] such that liability may attach." NIMMER, supra, § 13.01[B].

## III. SUBSTANTIAL SIMILARITY

 Two works are substantially similar if a hypothetical ordinary observer would view the works as a whole and "conclude that the defendant unlawfully appropriated the plaintiff's protectable expression." *T–Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97, 112 (1st Cir.2006) (quoting *Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir.2005)). Because substantial similarity is based only on a comparison of the copyrightable elements of a work, the Court must begin its analysis by paring away ideas, facts, and any other uncopyrightable elements. *See Johnson*, 409 F.3d at 19 ("[A] court must engage in dissection of the copyrighted work by separating its original, protected expressive elements from those aspects that are not copyrightable....").

Below, the Court holds that much of the content of the SMS works is not copyrightable because it is devoted to discussing concepts and processes. *See* 17 U.S.C. 102(b).[1] To the extent that the content could be characterized as expression, much of it is simply not original. *See Feist*, 499 U.S. at 348, 111 S.Ct. 1282. Ultimately, the Court concludes that SMS has failed to meet its burden of proving infringement because, when viewed as a whole, excluding the non-protectable material, an ordinary observer would not find the works to be substantially similar.

### A. COPYRIGHTABLE MATERIAL

#### 1. Only expressions are eligible for copyright

"[T]he Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 558, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). An intellectual property regime where authors could secure monopolies over ideas could hardly coexist with free expression. *See id.* Thus, despite what the term intellectual property might connote, "[t]he most fundamental axiom of copyright law is that no author may copyright his ideas...." *Feist*, 499 U.S. at 344–45, 111 S.Ct. 1282. While authors retain a limited monopoly over their original expression, the idea/expression dichotomy ensures that "every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication." *Eldred v. Ashcroft*, 537 U.S. 186, 219, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003).

Expression is a term that refers to the copyrightable portion of work; it describes the more tangible characteristics that distinguish a work from the underlying ideas. For example, one might say that John Lennon's classic song "Imagine" is based on the idea that individuals can bring about world peace through humanistic introspection. However revolutionary the idea may have seemed at the time, the notion that imagining can be a panacea for the world's ills is not protectable. Instead, the copyrightable aspects—the expression—are Lennon's lyrics and the particular notes that comprise the melody, harmony, and accompaniment. *See Golan v. Gonzales*, 501 F.3d 1179, 1184 (10th Cir. 2007) ("[Expression] refers to the particular pattern of words, lines and colors, or musical notes that comprise a work.") (internal quotation marks omitted).

---

1. Section 102(b) provides in full:

 In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

 17 U.S.C. 102(b).

Even though the law is clear about the rights that inure in each, the line between idea and expression resists definition. Judge Learned Hand, a towering figure in American copyright law, once observed that "no principle can be stated as to when an imitator has gone beyond the 'idea' and borrowed from its 'expression.' Decisions must therefore be inevitably ad hoc." *Peter Pan Fabrics Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). Nevertheless, Judge Hand formulated what has become known as the "abstractions" test:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of 'his ideas' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930).

The principles underlying the Learned Hand abstractions test are perhaps best explained by way of example. For instance, in *Cold Mountain*, a novel by Charles Frazier, a man who has been away at war sets off for home and a woman who is waiting for him there, but on the way he encounters many obstacles. When described at this level of generality, there is nothing copyrightable about the plot because it is merely an idea. In fact, at this level of abstraction, the plot is indistinguishable from Homer's epic tale of Ulysses's return from the Trojan Wars.[2]

As we include more of what Judge Hand would call "the incident" of Mr. Frazier's story, the novel takes the form of a copyrightable expression. The main character's name is W.P. Inman, and he is a Confederate deserter from an army hospital.[3] The love of Inman's life, and the

---

**2.** Any author is free to borrow or co-opt Homer's plot because it is in the public domain. *See Golan*, 501 F.3d at 1188 (noting the "principle that works in the public domain remain there"). Indeed, Ulysses' homeward journey has served as inspiration for numerous novels, James Joyce's *Ulysses* to name one, and films, including the Joel and Ethan Cohen's *Oh Brother, Where Art Thou?*.

**3.** Although Mr. Frazier's novel does not specify how or when Inman was injured, in the film *Cold Mountain*, Inman is wounded in the Battle of the Crater, fought just outside Petersburg, Virginia on July 30, 1864. Ulysses S. Grant, Personal Memoirs of U.S. Grant, Vol II 314–15 (New York, Charles L. Webster & Co. 1886). The battle was so named because the Union Army had tunneled under the Confederate lines and planted explosives in order to blow a hole in the line, thereby creating a strategic advantage that would enable the Union to break a month-and-a-half standoff. *Id.* at 307, 310. The Army of the Potomac, under the command of Major General George G. Meade, and its Ninth Corps commanded by Major General Ambrose Burnside, successfully detonated the explosives, killing between 250 and 300 Confederates and creating a crater a little larger than half a football field. Shelby Foote, The Civil War: a Narrative 535–36 (1974). Nevertheless, the Union squandered its strategic advantage when the first troops stopped in the crater, a maneuver that gave the Confederates time to recover and made the Union troops easy targets for soldiers firing down from the crater's edge. *Id.* at 536–37. Burnside compounded the error by failing to withdraw troops, even after it was clear that a rout was on. *Id.* at 537. The battle, which Grant characterized as a "stupendous failure," Grant, *supra*, at 315, ended in hours of brutal hand-to-hand combat and resulted in more than four thousand casualties for the Union and "about one third that number" for the Confederates. Foote, *supra*, at 537.

It is appropriate to note that law clerk Alex Ewing, Esq., the creative analyst behind this opinion, is the great-greatgrandson of George

reason for the journey that comprises much of the novel's plot, is Ada Monroe, a minister's daughter from Charleston who has moved to a rural community on Cold Mountain, North Carolina. On his way home from the military hospital near Raleigh, North Carolina, Inman faces numerous impediments, including imprisonment, starvation, and patrols charged with rounding up deserters. Meanwhile, Ada, who was raised in cosmopolitan Charleston, struggles to survive on the farm that would be the couple's home.

It is the characters, the events, and their precise sequence that distinguish Mr. Frazier's work from otherwise abstract notions of love, longing, and heroism that are found in *The Odyssey*.[4] Ultimately, much of *Cold Mountain* is copyrightable not merely because Mr. Frazier has taken the Greek epic and added details; rather, he has supplied details that are attributable to his creative spark.

### 2. Expressions must be original

The second requirement for copyright eligibility is originality. *See Feist*, 499 U.S. at 348, 111 S.Ct. 1282 ("Originality remains the *sine qua non* of copyright...."). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* at 345, 111 S.Ct. 1282. Although the quantum of creativity required is extremely low, the work must display least "a modicum of intellectual labor." *Id.* at 347, 111 S.Ct. 1282 (quoting

1 NIMMER ON COPYRIGHT, § 1.08[C][1] (1980)).

It is important to note that descriptions or techniques common to a given subject are not entitled to copyright protection. *Scenes a faire* are one such form of noncopyrightable expression. " '*Scenes a faire*' are incidents, characters or settings which, as a practical matter, are indispensable or standard in the treatment of a given topic." *Feder v. Videotrip Corp.*, 697 F.Supp. 1165, 1169 (D.Colo. 1988) (Carrigan, J.) (italics supplied). In *Feder*, a travel guide author sued a competitor alleging that the competitor had copied a video guide to Colorado ski resorts. Feder claimed to hold a copyright to a description of Aspen that characterized the city as "a glamorous, cosmopolitan playground of international renown for celebrities and the super-rich." *Id.* at 1170. The district court concluded that the description was not copyrightable in part because "the presence of celebrities and politicos is part of the area's '*scenes a faire.*'" *Id.* at 1170 (italics supplied). In other words, there · is nothing original about the observation that the rich and famous flock to Aspen.

### 3. No author may copyright a process

Even if a work constitutes original expression, no author may claim protection over a process. *See* 17 U.S.C. § 102(b). Works that offer techniques for developing a skill or reaching a goal teach an uncopyrightable process. For example, in *Palmer v. Braun*, 287 F.3d 1325, 1327 (11th

---

Washington Condrey, a sergeant in Lane's North Carolina Brigade, who believed until his dying day that he had accidentally shot Stonewall Jackson.

4. It is impossible to determine precisely when a creator has transformed an idea into an expression, but the following example may provide some guidance. No artist could hold

a copyright to a piece of marble. But, using the tools of his trade, the artist may translate his creative vision onto the medium. As he chisels away, a shape begins to appear. When a form has emerged such that a passerby peering into the window of his studio would not see the slab of marble, but a sculpture, the artist has created an expression.

Cir.2002), the creator of a self-help course aimed at exploring and expanding the consciousness of its participants claimed that Braun had appropriated various written materials, including a set of exercises designed to help participants "reconnect with their existence and experience the world more directly." The exercises in each program offered "a simple and effective technique for managing beliefs." *Id.* at 1332. Although the exercises prescribed by each program were "virtually identical," the court reasoned that "at bottom, [the exercises were] simply a process for achieving increased consciousness. Such processes, even if original, cannot be protected by copyright." *Id.* at 1334.

### 4. The amount of copyright protection to which a work is entitled varies depending upon the amount of protected expression

Copyrights vary according to the volume of protectable material in a given work. For example, in *Feist,* the Supreme Court addressed the scope of copyright for a white pages directory. The Court reasoned that "choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original" to qualify for protection. *Feist,* 499 U.S. at 348, 111 S.Ct. 1282. The "entirely typical" "selection, coordination, and arrangement of Rural's white pages d[id] not satisfy the [originality requirement] for copyright protection." *Id.* at 362, 111 S.Ct. 1282. Hence, the work was entitled only to a correspondingly "thin" copyright. *See id.* at 349, 111 S.Ct. 1282. Although it was undisputed that Feist had copied Rural's directory, the Court held that Rural was not entitled to recover for

infringement. *Id.* at 343, 364, 111 S.Ct. 1282.

Despite SMS's suggestion to the contrary, the principles articulated in *Feist* apply beyond the context of factual compilations. *See* Pl.'s Post Arg. Br. [Doc. No. 55] at 3, The reason a novel such as *The Sound and the Fury* is entitled to more protection than the white pages is quite simply that it contains more original expression. Benjy, Quintin, Jason, Caddy, and the rest of the Compson family did not pre-date Faulkner's conception. The plot, characters, and all of the prose are original. By contrast, the phone book in *Feist* was comprised of pre-existing facts that in no way could be attributed to Rural's creative genius. Hence, the phone book was entitled to only the thinnest of copyrights, which was not even enforceable against an admitted verbatim copier.

### B. SMS's Works Are Not Entitled to Robust Copyright Protection Because They Are Dominated by Unprotectable Material

█ SMS alleges that ASP has infringed materials associated with three programs, *Positive Power & Influence, Promoting and Implementing Innovation,* and *Positive Negotiation.* Although they are undoubtedly entitled to more protection than the white pages in *Feist,* they are dominated by unprotectable material. These works exemplify the sorts of training programs that serve as fodder for sardonic workplace humor that has given rise to the popular television show *The Office* and the movie *Office Space.*[5] They are aggressively vapid—hundreds of pages filled with generalizations, platitudes, and observations of the obvious. While the

5. Programs of this ilk are by no means unique to the private sector. Even the Federal Judicial Center offers courses and materials designed to encourage more efficient and effective workplaces. *See generally* Joy A. Richardson, Frontline Leadership, Working, Team Effectiveness, and Leadership 2000 (Federal Judicial Center 1998).

workbooks' vague character may serve SMS well in the marketplace where it meets the demands of clients in different industries, they lack the "incident" that Judge Hand described as essential for differentiating the works from the underlying ideas. To the extent that the works contain expression, they are largely noncopyrightable because they are devoted to describing a process or because they are not original.

## 1. The works have no copyrightable structure or essence because they are devoted to discussing concepts and processes

SMS maintains that each of ASP's works infringes "structure, content and flow" of its own. Pl.'s Mem. Supp. Summ. J. at 13. In other words, SMS alleges infringement by comprehensive nonliteral similarity. NIMMER, *supra*, § 13.03[A][1], at 13–36. Comprehensive nonliteral similarity refers to similarity "not just as to a particular line or paragraph or other minor segment, but where the fundamental essence or structure of one work is duplicated in another." *Id.* (footnotes omitted). The nonliteral similarity inquiry is meant to capture what the Second Circuit has termed "inexact-copy infringement." *Id.* (quoting *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 133 n. 5 (2d Cir.2003)).

■ The challenge of assessing comprehensive nonliteral similarity is discerning when a work's "fundamental essence or structure" is an original expression. NIMMER, *supra*, § 13.03[A][1], at 13–36. The Learned Hand abstractions test, which is premised on the notion that works may be described at varying levels of abstraction, provides guidance. That test, combined with what is known as the Chafee "pattern" test, suggests that the "operative pattern for purposes of determining substantial similarity is one that is in some degree abstract (omitting dialogue, minor incidents and possibly setting, etc.), but is nevertheless sufficiently concrete as to contain an expression of the sequence of events and the interplay of the major characters." *Id.* at 13–38, 13–39 (footnotes omitted). Although the test clearly applies to works of creative fiction, the principle has broader application. Regardless of the context, the appropriate pattern would seem to be one that is abstract, but nevertheless includes sufficient copyrightable detail to be considered an original expression.

Here, the works at issue are so dominated by nonprotectable material that it is impossible to reduce the work to a copyrightable essence or structure. For example, at the core of *Promoting and Implementing Innovation* is the not-so-stunning revelation that some people who have ideas about how better to run a business may face resistance from people who will be affected by any deviation from current practices. The innovator may need to employ different strategies, including but not limited to logic or basic interpersonal skills, to overcome that resistance. In other words, *Promoting and Implementing Innovation* offers tips for how to run ideas up the chain of command. Even if descriptions of the proffered tactics for idea championing were original (they are not), they focus on concepts and teach a noncopyrightable process.

By contrast, in *The Sound and the Fury* or *Cold Mountain* it is possible to capture the structure or essence of the work by summarizing the plot and including the major characters. This essence is copyrightable precisely to the extent that the plot and characters are original expressions. In this case, it is possible to summarize the work at various levels of abstraction, but the analogs to characters and plot found in *The Sound and the Fury*

or *Cold Mountain* are processes and ideas. Summaries of SMS's works are not copyrightable because their content is not protectable. Thus, the well-established principles underlying the Learned Hand abstractions test dictate that a copyright inheres only somewhere near the literal textual level. The Court therefore concludes that the structure or essence of SMS's works is not copyrightable.

SMS's works do contain copyrightable expressions, but its right to exclude others is limited to little more than its original text and formatting. At their creative zenith, these works translate common-sense communication skills into platitudinal business speak. One engaged in the industry might refer to the practice as jargonization. When an noncopyrightable idea is cloaked in a neologism such as "innovision," copyright law permits protection over the cloak, but not the concept or the process it describes. *See* 17 U.S.C. 102(b). Harwood, Moore, and anyone else is free to create programs addressing the same topics and processes, so long as their final product is sufficiently distinct.

## 2. SMS is not entitled to copyright of its creative choice

██ SMS maintains that there are "literally thousands" of creative choices entitled to copyright protection. Pl.'s Mem. Supp. Summ. J. at 5. "Such creative choices include, among many others, the selection of topic, and the manner in which one chooses to present the materials. . . ." *Id.* at 5–6. SMS emphasizes that

> there are hundreds of ways to approach the topic and, as we have observed, a teacher in this arena can choose to teach through business parables (a la "The One Minute Manager" by Ken Blanchard), religious metaphor (a la "The Management Methods Of Jesus: Ancient Wisdom For Modern Business" by Bob Briner), peppy and inspirational instructions (a la "You Can Negotiate Any-

thing," by Herb Cohen), dry academic tomes (a la "Conflict and Conflict Management," Marvin C. Dunnett, ea., "Handbook of Industrial and Organizational Psychology," Chicago: Rand–McNally), etc.

Pl.'s Post Arg. Br. at 3 (footnote omitted). Thus, SMS contends that its creative choice, which it maintains applies to the decision to use surveys, certain types of charts, and other teaching tools, gives it a right to exclude others from employing a similar approach.

SMS is simply mistaken. That a particular design was the product of a creative choice does not render the design copyrightable; rather, the focus of the inquiry remains whether the ultimate product of that choice is entitled to protection. In *Yankee Candle Co., Inc., v. Bridgewater Candle Co., LLC,* 259 F.3d 25 (1st Cir. 2001), Yankee Candle claimed that Bridgewater infringed its copyright to the design of several scented candles. In particular, Yankee Candle maintained that Bridgewater's labels copied various design elements of its labels, including "(I) the use of a rectangular 'title plate' with block lettering on a white background; (ii) the imposition of that title plate, centered, on a photographic representation of the candle fragrance; and (iii) a rectangular border around the photograph." *Yankee Candle,* 259 F.3d at 35. Like SMS in this case, Yankee Candle argued "that its choices to use such elements were 'discretionary,' and must be protected by copyright because other choices were possible." *Id.* The First Circuit rejected this argument, concluding that "the collection of common geometric shapes with a particular photographic technique is not sufficiently original to qualify for copyright protection." *Id.*

Here, as in *Yankee Candle,* there is no question that the compilation of the works

at issue involved a significant number of creative choices. Nevertheless, the clear import of *Yankee Candle* is that the decision to combine unprotectable elements does not render the resulting product original.

### C. SMS Has Failed to Demonstrate that an Ordinary Observer Would View the Accused Works as Substantially Similar to Its Own

"Substantial similarity can be measured by the ordinary observer test. Under that test, two works will be said to be substantially similar if a reasonable, ordinary observer, upon examination of the two works, would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression." *T–Peg*, 459 F.3d at 112 (1st Cir.2006) (internal citations and quotation marks omitted). The analysis "focuses holistically on the works in question and entails proof that the copying was ... extensive." *Johnson*, 409 F.3d at 18. It is important to note, however, that "[t]he inquiry focuses not on every aspect of the copyrighted work, but on those aspects of the plaintiff's work [that] are protectible under copyright laws and whether whatever copying took place appropriated those [protected] elements." *T–Peg*, 459 F.3d at 112 (quotation marks omitted).

In order to clarify an often muddled analysis, Professor Nimmer distinguishes between (1) "comprehensive nonliteral similarity" and (2) "fragmented literal similarity." Nimmer, *supra*, § 13.03[A][1], at 13–36. As the court has discussed above, SMS's works have no copyrightable essence or structure that ASP could have infringed. Thus, the Court will turn its attention to alleged instances of verbatim copying or crude paraphrasing.

"Fragmented literal similarity exists where the defendant copies a portion of the plaintiff's work exactly or nearly exactly...." *Newton v. Diamond*, 349 F.3d 591,

596 (9th Cir.2003) (amended upon the denial of rehearing *en banc* on grounds unrelated to the proffered definition). "No easy rule of thumb can be stated as to the quantum of fragmented literal similarity permitted without crossing the line of substantial similarity...." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 943 (10th Cir. 2002) (internal alteration omitted) (quoting Nimmer, *supra*, § 13.03[A][2] ). Where verbatim appropriation has occurred, whether such copying constitutes substantial similarity generally depends upon the sheer volume of the copying as well as the relative importance of the text to the original work. *See Palmer*, 287 F.3d at 1330 ("[T]he work may copy only a small part of the copyrighted work but do so word-for-word. If this fragmented copy is important to the copyrighted work, and of sufficient quantity, then it may support a finding of substantial similarity.").

The Court thus examines each accused work and its SMS counterpart, assessing SMS's allegations of similarity.

#### 1. SMS's *Positive Power & Influence* and ASP's *Communicating 2 Influence* are not substantially similar

■ SMS contends that "ASP chose not only to begin its preliminary work on [*Communicating 2 Influence* ] with a questionnaire just as SMS did in [*Positive Power & Influence* ]—they chose to ask the audience the same question and even went so far as to emphasize the importance of the working relationship of the reviewing peer or colleague." Pl.'s Mem. Supp. Summ. J. at 13.

The problem with SMS's example is that much of the substance ASP allegedly has copied is simply not copyrightable. ASP's argument that such techniques are common teaching tools in the field of adult education resonates with the Court. Indeed, the Court notes that the Federal Judicial Center training program men-

tioned in footnote five, *supra*, contains various self-assessment exercises. *See* RICHARDSON, *supra*, at 11, 19, 24. In addition, SMS includes self-assessment at or near the beginning of the other works at issue, *Promoting and Implementing Innovation* and the *Positive Negotiation Program*, with a self-assessment. *See* SMS, *Implementing Innovation* [Doc. No. 42, Ex. E pt. 1], at 010063; DAVID E. BERLEW, ET. AL., THE POSITIVE NEGOTIATION PROGRAM 1–19 (SMS, 3d Ed. 1991).[6] ASP has provided evidence that self-assessment is common to any manner of self-help/self-improvement programs. Harwood Decl. ¶¶ 5–8. The Court therefore concludes self-assessment is essentially a *scenes a faire* and is no more copyrightable than a teacher's use of a chalk board to teach multiplication tables or state capitals.

■ In addition, SMS emphasizes that ASP employs a five-point rating scale to facilitate the self-assessment. ASP avers that there are only a "few proven ways to effectively educate adults in organizations...." Harwood Decl. ¶ 5. These methods, they argue, are "based in research in the industry as well as client experience" and have been the subject of decades of work by researchers in the field of adult education. *Id.* ¶¶ 5–6. Harwood summed up ASP's position in his affidavit:

> [C]ertain elements of the work are widely used ideas, such as rating something on a scale of 1–5 or seeking feedback from peers. Cognitive psychologists frequently refer to the concept of the 'magic number seven +/–2.' This notion argues that human beings can retain in memory only 5–9 categorical differences relating to any one item. Likert rating scales, such as assessment instruments used by SMS, ASP, and many others, typically use 5–or–7 point rating scales. Any larger number of selections does

not produce an increase in accuracy, reliability, or validity.

*Id.* ¶ 9.

SMS has failed to produce any evidence that such rating scales are in fact original to SMS. This is probably because the five-point rating scale is highly intuitive and commonly employed in a variety of industries. The five-point rating scale offers a simplicity and symmetry that would be attractive to potential users. For example, a typical consumer survey at a book store might ask, "How often do you use our online catalog?" The five-point scale presents five logical, easy-to-gage responses for any given question: "rarely, less than average, average, more than average, frequently." The Court therefore holds that no copyright inheres in SMS's use of a five-point rating system.

■ In both the SMS and ASP works, the surveys focus on how well a participant uses basic communication skills such as finding ways to demonstrate that you are listening to the other members of a conversation, using "facts and data in support or opposition," or "highlighting common values, beliefs, ideas, agreement, or synergy." SMS, *Positive Power and Influence*, Def.'s Ex. X [Doc. 49] at 010410. The Court finds that the substance of the advice that serves as the basis of the survey does not constitute original expression because it is merely a summary of common-sense communication skills. At most, SMS is entitled to protection against verbatim duplication or crude paraphrasing of this particular portion. While there are certainly many similarities, once the noncopyrightable material is pared away, it is evident that ASP successfully wrote around SMS's limited protected expression.

---

**6.** This citation appears in a different format because the referenced portion of The Positive Negotiation Program appears to have been omitted from the electronic docket.

SMS's second proffered example of substantial similarity appears in the *Communication 2 Influence* workbook. The page at issue, a "C2I Skills Guide," is a summary presentation of the communication skills already addressed in the survey. *Id.* at 010309. The skills are broken down into sections and labeled with gerunds— "Inquiring," "Reflecting," "Aligning," "Requiring," "Convincing," etc. *Id.* SMS maintains that this section is substantially similar to the "influence" section of its work, where SMS uses words like "Persuading," "Asserting," "Briding," [sic] "Attracting," "Disengaging," and "Avoiding." Pl.'s Mem. Supp. Summ. J. at 15.

To begin, this section appears to teach a noncopyrightable process because it offers participants suggested means to accomplishing a goal. *See* 17 U.S.C. 102(b); *Palmer*, 287 F.3d at 1332. But even if it did not, this Court fails to see how anyone could obtain a limited monopoly over the use of gerunds or teaching skills such as "Inquiring," a technique that entails "[a]sking questions" of other participants in a conversation. ASP, *Communicate 2 Influence*, Def.'s Ex. X at 010309. Thus, SMS is entitled only to a limited copyright. Again, ASP has not crossed the line because there is a disparity in content and format, and there is no verbatim duplication or crude paraphrasing.

SMS also observes that there are few instances of literal duplication. But the fact that phrases such as "follow-up questions," *id.*, appear in two works purporting to teach "basic communication skills" is hardly surprising. ASP, *Communicating 2 Influence* [Doc. No. 42, Ex. L] at 010284.[7] Such de minimis duplication does not amount to infringement.

Even assuming that the Court found these isolated passages to be sub-stantially similar, and taking into account the few minor incidents of verbatim repetition, the Court finds that the works as a whole are not substantially similar. *Communicating 2 Influence* may contain passages that are similar to certain passages in *Positive Power & Influence,* but the question is not whether a passage or even multiple passages are similar. Rather, the Court must inquire whether an ordinary observer, viewing the copyrightable aspects of the works as a whole and excluding the noncopyrightable elements would conclude that they are substantially similar. *See T–Peg*, 459 F.3d at 112. These are both fairly extensive workbooks. *Communicating 2 Influence* is comprised of nearly 100 pages of text and other interactive materials. *See* ASP, *Communicating 2 Influence* [Doc. No. 42, Ex. L] at 010282–010374; *see also id.* at [Doc. K pt. 1–4].[8] *Positive Power & Influence* contains multiple components and is of a similar scale. *See* SMS, *Positive Power & Influence* [Doc. No. 42, Ex. P pt. 1], at 011846–011929, 11930–12091. Given this scope, two instances of alleged structural similarity do not constitute substantial similarity.

The Court therefore finds that an ordinary observer would not view *Communicating 2 Influence* and *Positive Power & Influence* to be substantially similar.

## 2. SMS's *Promoting and Implementing Innovation* and ASP's *Championing Ideas* are not substantially similar

SMS highlights a portion of *Championing Ideas* where ASP lays out a process for developing and implementing a "FutureFrame." Pl.'s Br. Sup. Sum. J. at 17. SMS asserts that ASP's discussion of "FutureFrame" infringes SMS's description of "Innovision." *Id.* SMS's argument

---

7. Unfortunately, the page numbers do not appear in the electronic form of this document.

8. Unfortunately, most of these pages are not numbered as part of the record.

misses the mark because "Innovision" is a noncopyrightable process comprised of unprotectable concepts.

"Innovision" is a process whereby participants are "invited ... to imagine a world in which the reader's new idea had been implemented by his or her organization." *Id.* at 16. Lest any participant labor under the delusion that realizing his vision will be easy, SMS reminds him, in bold lettering, "[e]ven if the innovation is in the best interest of the organization, some stakeholders [i.e. people affected by the decision] may resist because it is against their self-interest or because they have a different perception of organizational interests." SMS, *Promoting and Implementing Innovation* [Doc. No. 42, Ex. E pt. 1], at 010070.

SMS offers a guide for "Idea Champions (sometimes called 'intrapreneurs')" who dare to navigate this veritable minefield of self-interested stakeholders. *Id.* at 010071. The prescription includes "Logical Persuasion," which the reader will be astonished to learn is "the use of facts and logic to convince others to accept ideas, proposals, and changes." *Id.* [Doc. No. 42, Ex. E pt. 2] at 010144. Lest the aspiring "intrapreneur" feel at a loss as to the purpose of this tactic, SMS informs him—again in bold—that "[t]he objective of Logical Persuasion is to 'convince.'" *Id.* The explanations for the other strategies, "Prescription," "Exchange," and "Participation," and "Common Vision," are similarly enlightening. "Exchange," for example, is "giving something to another party in return for their agreement, cooperation, or support." *Id.* at 010146.

"Innovision" is noncopyrightable for three reasons. First, it amounts to instructions about generating an idea. While SMS may retain a copyright to this play on words, it cannot retain the copyright to the process underlying it. *See* 17 U.S.C. 102(b). Nor does it retain any copyright to the "editorial decision" to create a new word. *See Yankee Candle*, 259 F.3d at 35. The crafting of neologisms entitles the copyright holder to protection of those new words that display the requisite creative spark; it does not entitle the creator to a limited monopoly over otherwise unprotectable content. *See id.*

Furthermore, it is clear that "innovision" is nothing but a collection of ideas. "Prescription," "Exchange," "Participation," for example, are ideas about different ways to persuade a stakeholder. Finally, even if these concepts were expressions, they are not original. It is inconceivable that this or any other court could permit a copyright to what amounts to instructions for engaging in a basic thought process. Although SMS may claim protection against verbatim copiers, anyone is free to describe the process of generating an idea.

The fact that ASP employed the term "FutureFrame" is sufficient to avoid infringement of SMS's limited copyright.[9] "Innovision" appears to be a play on "envision" with the "into" meant to invoke the word innovation. In ASP's version, the catch-phrase is memorable for its alliteration. That the idea will be realized in the future is implied in SMS's term, ASP's word makes an explicit reference. Moreover, while frame connotes a static picture

---

9. It is not difficult to imagine any number of different names that could be used to describe this process. Given the business context, perhaps one who is so inclined could use the term "Daydreaming for Dollars." Even the word "thinking" might suffice. While SMS may retain a limited monopoly over the term "innovision", those who want to encourage others to envision something can and will likely do as ASP did and choose a different word. Indeed, it is unlikely that Dr. King's visionary address would have become a pillar of American rhetoric had it been entitled "I Have an Innovision."

(a photo encapsulate by a frame or a single frame of a motion picture), innovision conjures a more dynamic process. In short, when removed from their noncopyrightable context, it is unlikely that an ordinary observer would find the terms similar.

It is important to emphasize that the Court's conclusion has nothing to do with the merit of "innovision" or any of the ideas contained in SMS's programs. Even Darwin could not have copyrighted the theory of natural selection outlined in *The Origin of the Species*.[10] *See Feist*, 499 U.S. at 349, 111 S.Ct. 1282 ("[N]o matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking.").

■■■ SMS emphasizes that Module 3 of *Championing Ideas* is entitled "Surveying Stakeholders," while Section 3 of *Promoting and Implementing Innovation* is labeled "Stakeholder Mapping." Nevertheless, ASP has presented credible evidence that this is a common term in the industry.2d Harwood Decl. [Doc. No. 49] ¶ 5. SMS has produced no evidence to the contrary, and the Court is persuaded that no copyright inheres in SMS's use of the term "stakeholder." Moreover, as the Court outlined above, there is nothing copyrightable about the observation that some members of an organization might not be willing to go along with an idea absent persuasion. SMS, *Implementing Innovation* [Doc. No. 42, Ex. E pt. 1], at 010070.

■■■ SMS also maintains that ASP appropriated "The Innovation Process," a graphic depiction of an idea from "Idea Generation," "Development," "Testing and Demonstration," "Formal Approval," and "Implementation." *Id.* at 010059. The accused page of *Championing Ideas* is entitled "The Progress of an Initiative," which outlines four steps: "Idea," "Concept and Design," "Initial Testing," and "Preparation for Launch." ASP, *Championing Ideas* Def.'s Ex. U, at 010015. Again, the Court concludes that this comparison may not serve as a basis for a finding of infringement. To begin, as the title indicates, it is a process. Moreover, SMS's graphic represents nothing more than a vague description of the progression of an idea through development to implementation. This Court cannot conclude that such an abstract description, which contains little in the way of "incident," distinguishes the graph from the idea underlying it. Finally, it is simply not original.

■■■ Given the limited copyright ability of such a description, ASP has successfully avoided infringement. There is no verbatim replication of words or phrases, and the graphical depictions are quite distinct. Although each takes the form of a flow chart, ASP's progresses from the top left of the page to about midway down the right side. A section labeled "Some Typical Concerns" consumes the bottom half of the page. By contrast, the SMS flowchart takes the form of a large upside-down goalpost that takes up three-quarters of the page. "Innovation Research Bulletins" appear below. In short, the graph's copyrightable presentation would not appear substantially similar to the ordinary observer.

---

10. Apropos of naming concepts, it is interesting to note that *The Origin of the Species* does not actually include the word evolution. The term was taken from the last word of the book's last sentence, which states,

> There is a grandeur in this view of life, with its several powers, having been originally breathed by the Creator into a few forms or into one; and that, whilst this planet has gone cycling on according to the fixed law of gravity, from so simple a being endless forms most beautiful and most wonderful have been, and are being *evolved*.

CHARLES DARWIN, THE ORIGIN OF THE SPECIES 529 (Charles Elliot ed., Harvard Classics 1909) (1859) (emphasis supplied).

In addition, SMS highlights ASP's section entitled "Typical Origins of Resistance," which it avers is substantially similar to an unlabeled page in *Promoting and Implementing Innovation*. ASP, *Championing Ideas*, Def.'s Ex. W [Doc. No. 49] at 010031. SMS's page also outlines a variety of reasons why stakeholders might not be on board with implementing an "innovision." The SMS page lists ten potential reasons for resistance: "1) Low perceived value; 2) Incompatibility with the status quo; 3) Risk of failure; 4) Uncertainty and fear of the unknown; 5) Lack of credibility; 6) Lack of flexibility and support for transition; 7) Previous failures; 8) Threat to vested interests; 9) The 'Not Invented Here' (NIH) Syndrome; 10) Lack of control." SMS, *Promoting and Implementing Innovation* [Doc. No. 42, Ex. E pt. 1], at 010102. ASP also outlines ten potential rationales for resistance: "High Cost; Too Much to Lose; Interests in Conflict; 'Not Invented Here'; Past Failures; High Discomfort; 'Big Picture' Unclear; Perceived Risk; Low Payoff; No Perceived Need." ASP, *Championing Ideas*, Def.'s Ex. W at 010031.

Here again, the original expression is limited to presentation and the particular terms used to describe otherwise uncopyrightable concepts. The verbatim repetition of words is limited to three instances: "perceived," "failures," and "Not Invented Here." "Perceived" and "failures" appear as fragments of phrases in the SMS guide. These are commonly occurring words in the English language; any overlap with respect to these two words hardly comprises the backbone of an infringement claim. The phrase "Not Invented Here" appears as "The 'Not Invented Here' (NIH) Syndrome." Thus, ASP did not appropriate the creative pearl of the page, which characterizes ostensibly obtuse co-workers as disease-ridden. Indeed, ASP seems to have strayed from likening any of the proffered rationales to physical or mental infir-

mity. Even presuming outright appropriation of this particular phrase, it is of little importance throughout more than 100 pages of text.

In sum, *Championing Ideas* and *Promoting and Implementing Innovation* exhibit neither comprehensive nonliteral or fragmented literal similarity. The Court finds that the works are not substantially similar.

### 3. SMS's *Positive Negotiation Program* and ASP's *Negotiating Successful Agreements* are not substantially similar

 SMS rests its case for infringement of *Negotiating Successful Agreements*, in part, on its allegation that "ASP's [*Positive Negotiation Program's*] objectives for the program track SMS's.... Both cite goals of assisting the participants to 'manage' the 'process' of negotiation." Pl.'s Mem. Supp. Summ. J. at 19. This contention apparently refers to a page in *Negotiating Successful Agreements* labeled "Outcomes and Expectations." Def.'s Ex. X at 2. There, ASP sets, among five others, the goal that participant should "[learn to manage the process of coming to an agreement." *Id.* ASP also states that a participant should "choose the best strategy and tactical approach for any negotiation circumstance." *Id.* The concept of managing a negotiation does not constitute expression, especially when phrased at such a high level of abstraction.

 In addition, SMS highlights the fact that "both programs stress planning tools as necessary items to structuring negotiations." Pl.'s Mem. Supp. Summ. J. at 19. SMS does not even claim that ASP has co-opted tactics or strategies; rather, SMS's argument seems to be that the decision to stress pre-negotiation planning, even in the generic sense, is evidence of infringement. This argument is without merit. The idea that one should consider

the objectives of the negotiation, the relative power of the participants, and the tactics that may be effective is hardly a novel concept, much less an original expression.

In sum, there is no structural similarity, and there are few instances where SMS and ASP use the same words. When they do, such instances are few and far between and the words tend to be of minimal importance. The Court therefore finds that *Negotiating Successful Agreements* and *The Positive Negotiation Program* do not exhibit substantial similarity.

### 4. ASP's motivations are not relevant because SMS has failed to prove substantial similarity

■ Finally, the motivations of former SMS employees are irrelevant because the works are not substantially similar. In a post-hearing brief, SMS emphasizes that "there was profound bitterness when the Malouf family took over SMS as a result of litigation and ASP's Moore and Harwood were both fired. Moore threatened to get even with Ms. Malouf by stealing SMS materials and take [sic] their clients." Pl.'s Post Arg. Br. at 4 (footnote omitted). SMS misses the point; bitterness, however profound, is not the touchstone of copyright infringement. "[A] defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's." *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 501 (2d Cir.1982) (quoting *Warner Bros. v. ABC*, 654 F.2d 204, 210 (2d Cir.1981)).

For example, presuming Shakespeare's poetry was subject to copyright, an aspiring poet might purchase a collection of his sonnets and select one to serve as the inspiration for her own poem. She might select Sonnet 18 and attempt to emulate the poem's depiction of unwavering beauty by borrowing his iambic pentameter and even a word or short phrase, fully intending to write a poem that will usurp the Bard's virtual monopoly on romantic sonnets and win fame and fortune for herself in the process.[11] The aspiring poet's motives are of no moment so long as the final product is not substantially similar to the original. *See Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 930 (7th Cir.2003) ("Suppose one copied a long passage from a copyrighted work and then edited it to produce a paraphrase so loose that it would not be similar enough to the original to constitute an infringement. The fact that the paraphrase had been 'derived' in a genetic sense from a copyrighted original would not make it infringing.").

In this case, the Court has already found that, like the aspiring poet, Harwood and Moore used SMS's works to create ASP's. Even if they smuggled copies of SMS's

---

11. Lest the Court be accused of infringement, the preceding example is extrapolated from section 13.03[B][1] of Professor Nimmer's treatise on copyright. Sonnet 18 reads:

Shall I compare thee to a summer's day?
Thou art more lovely and more temperate:
Rough winds do shake the darling buds of May,
And summer's lease hath all too short a date:
Sometime too hot the eye of heaven shines,
And often is his gold complexion dimm'd;
And every fair from fair sometime declines,
By chance, or nature's changing course, untrimm'd;
But thy eternal summer shall not fade,
Nor lose possession of that fair thou owest;
Nor shall Death brag thou wander'st in his shade,
When in eternal lines to time thou growest;
So long as men can breathe, or eyes can see,
So long lives this, and this gives life to thee.

programs and poured over them, redlining and rewriting, such "intentional dissimilarity" is permissible. *See* NIMMER, *supra,* § 1302[B][1][b], at 13–69; *see also Bucklew,* 329 F.3d at 930.

## IV. CONCLUSION

The Court is not blind to the reality that this case is about market share. SMS undoubtedly believed that the years of labor that went into producing these products gave it the right to exclude ASP and others. But as the Supreme Court observed in *Feist,* "[t]he primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.' Art. I, § 8, cl. 8." *Feist,* 499 U.S. at 349, 111 S.Ct. 1282 (alteration omitted). If SMS wants to keep ASP or any other company out of the marketplace, then it will have to negotiate a successful agreement to realize its innovision.

The Court finds that ASP copied SMS's works. Nevertheless, the Court concludes that the copying is not actionable because ASP's works are not substantially similar. Judgement therefore enters for ASP.

SO ORDERED.